NATIONAL AIR FREIGHT FORWARDING CORP. et al. v. CIVIL AERONAUTICS BOARD.

No. 10630.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 24, 1951.

Decided April 10, 1952.

Prettyman, Circuit Judge, dissented.

Robert E. Quirk, Washington, D. C., with whom Robert E. Webb, Washington, D. C., was on the brief, for petitioners.

J. Roger Wollenberg, Sp. Asst. to the Atty. Gen., of the Bar of the Supreme Court of California, *pro hac vice*, by special leave of Court, with whom Asst. Atty. Gen. H. G. Morison and Emory T. Nunneley, Jr., Gen. Counsel, Civil Aeronautics Board, John H. Wanner, Associate Gen. Counsel, Civil Aeronautics Board, and O. D. Ozment, Atty. Civil Aeronautics Board, Washington, D. C., were on the brief, for respondent. Warren L. Sharfman, Washington, D. C., also entered an appearance for respondent.

Before PRETTYMAN, BAZELON and WASHINGTON, Circuit Judges.

BAZELON, Circuit Judge.

Air freight forwarders, like their surface counterparts, are common carriers who consolidate individual shipments into bulk lots for transportation. In addition, they perform certain other services, such as picking up freight at point of origin, delivering it to its ultimate destination from air terminals, and planning the routing of shipments. Forwarders do not themselves perform the basic transportation; this is done by an underlying air or surface carrier. The charge to shippers for the forwarder's service is an amount equal to or slightly in excess of the rate which the individual shipper would pay if he were to ship his freight directly. The freight forwarder, in turn, ships at a lower bulk rate. From the spread between these two rates, the forwarders must draw their expenses and profit.

Freight forwarders have long existed in the field of surface transportation. Their importance was recognized in 1942 when a separate chapter providing for their regulation was added to the Interstate Commerce Act.[1] The present Civil Aeronautics Board order marks their initial mass entry into the field of air transportation.[2] Among the many applicants for permission to operate as air freight forwarders[3] were three whose relationship to railroads raised problems under § 408 of the Civil Aeronautics Act of 1938.[4] One of these applicants, National Air Freight Forwarding Corporation,[5] now seeks reversal of that portion of the order denying it operating authority.

Air Freight advances three reasons as a basis for reversal: (1) the CAB erred in measuring its application by criteria found in § 408 of the Civil Aeronautics Act;[6] (2) certain findings of the Board are not sup-

[1] Part IV, Interstate Commerce Act, 56 Stat. 284 (1942), 49 U.S.C.A. § 1001 et seq.

[2] In an appeal from a portion of the Board's order not now in issue, several parties unsuccessfully challenged the CAB's action in letting freight forwarders into the air transportation field at all. American Airlines, Inc., v. Civil Aeronautics Board, 7 Cir., 1949, 178 F.2d 903.

[3] Many applicants requested certificates of public convenience and necessity. The Board concluded, however, that in view of the experimental nature of the air freight forwarder program, it would grant temporary exemptions for a maximum of five years under § 1(2) of the Civil Aeronautics Act, 52 Stat. 973, 977 (1938), 49 U.S.C.A. § 401(2), rather than certificates under § 401, 52 Stat. 973, 987 (1938), 49 U.S.C.A. § 481. Air Freight Forwarder Case, 1948, 9 C.A.B. 473, 493–501.

[4] 52 Stat. 973, 1001 (1938), as amended, 49 U.S.C.A. § 488.

[5] Hereafter referred to as Air Freight. Its parent, National Carloading Corporation, is also a party to this suit.

[6] The Board did not apply the restrictive

ported by the evidence; and (3) the Board acted arbitrarily and capriciously in granting certain applications while denying permission to Air Freight.

Section 408(a)(5) of that Act [7] makes it unlawful, without CAB approval,[8] "For any * * * common carrier * * * to acquire control of any air carrier in any manner whatsoever." There is no dispute that an air freight forwarder is an air carrier.[9] Nor can there be any doubt that Air Freight is controlled by a common carrier; for all of its stock is owned by a common carrier, National Carloading Corporation, one of the largest surface freight forwarders. National Carloading's stock is, in turn, owned by railroad interests. The initial question which must be resolved is whether a grant of authority to Air Freight to enter the air freight forwarding field would result in the acquisition of an air carrier by a common carrier within the meaning and intent of § 408. If the grant of authority would not result in a technical acquisition under § 408, then we must ascertain whether the CAB can nevertheless consider the policies of that section in a proceeding instituted under § 1(2).

While there is no doubt that § 408 applies where a common carrier acquires control of an established air carrier, the parties dispute its application where, as here, control is acquired of a newly-organized company applying to enter the air transportation field for the first time. Since

such a company is not an air carrier until a certificate has been issued, it would appear at first blush that its relationships to other types of carriers are not subject to the restriction of § 408. It has been held, however, in Pan-American Airways Co. v. Civil Aeronautics Board, 2 Cir., 1941, 121 F.2d 810, that the very process of certification brings the control relationships between the newly certificated air carrier and its parent within § 408. Otherwise a common carrier seeking entry into the air transportation field would be able to evade § 408 merely by organizing a subsidiary and causing it to apply for a certificate of public convenience and necessity under § 401. We agree with the Pan-American decision that it would be unwise for the Board to close its eyes to the fact that with completion of the certification process, there would be in existence an air-surface carrier control relationship which important segments of the Act were designed to regulate.[10]

Even if Pan-American were not persuasive and this case were not treated as a combined § 401 and § 408 proceeding, we think there is ample support for the proposition that the Board may apply the policies of § 408 in a § 401 proceeding, even where there is no technical § 408 control relationship. Recent decisions of the Supreme Court with regard to the Interstate Commerce Act make it clear that all the policies of a regulatory statute become elements of

---

standard of the second proviso of § 408 (b) to Air Freight or to any other applicant. The Board said that this proviso is "directed to the case of control of a direct air carrier by a direct common carrier * * *." Air Freight Forwarder Case, 1948, 9 C.A.B. 473, 503. Air freight forwarders are indirect air carriers. See cases cited note 9, infra. Petitioner was one of approximately twenty persons whose applications called for special consideration under § 408.

7. 52 Stat. 973, 1001 (1938), 49 U.S.C.A. § 488(a) (5).

8. CAB approval is conditioned on compliance with the standards laid down in § 408(b), 52 Stat. 973, 1001–2 (1938), 49 U.S.C.A. § 488(b).

9. Railway Express Agency, Grandfather Certificate, 1941, 2 C.A.B. 531; Universal Air Freight Corporation, Investigation, 1942, 3 C.A.B. 698.

10. The Pan American case also decided that where a technical § 408 question is presented, compliance with § 408 is not a prerequisite to issuance of a certificate under § 401, "though the ability of [the applicant] to meet the standards [of § 408] might be considered by the Board * * * in connection with granting certificates of public convenience and necessity." Pan American Airways Co. v. Civil Aeronautics Board, 2 Cir., 1941, 121 F.2d 810, 816.

the public interest to be weighed in a certification proceeding.[11]

Having decided that § 408 does apply to Air Freight, we must next consider petitioner's argument that the Board erred in concluding "that the authorization of National Air Freight Forwarding Corporation to engage in air transportation as an air freight forwarder would not be consistent with the public interest."[12] To support this conclusion, the Board found that (1) Air Freight would have a competitive advantage over other air freight forwarders resulting from its railroad connections and (2) because Air Freight was controlled by powerful railroads, an incentive to divert potential air freight traffic to the railroads would exist. Petitioner challenges the adequacy of the evidence to support these findings. We think that the record as a whole discloses substantial evidence to support these conclusions, and in the face of such evidence we cannot set the administrative judgment aside.[13]

■ The CAB found as undisputed fact that Air Freight was indirectly controlled by three railroads—Chesapeake & Ohio, Pere Marquette, and Erie—which comprise a great sector of the American railroad industry, and directly by one of the three largest surface freight forwarders; and that Air Freight will use the facilities of its direct parent, National Carloading.[14] It is conceded that National Carloading uses some of the facilities of the railroads, especially office and warehouse space.[15] From these facts the Board concluded that railroad facilities would be used to the competitive advantage of Air Freight.[16] Faced with some fifty other air freight forwarder applicants who did not present the problems involved in Air Freight's application and who were fit and willing to meet the public need for air freight forwarder service, the Board decided that it would not be in the public interest to give Air Freight operating authority. "We are unable to say * * * that the [Board] erred in reaching the result it did. The facts being undisputed, we are free to disturb the * * * conclusion only if it lacks any rational and statutory foundation."[17] Whether or not we would have reached the same result is not

11. United States v. Rock Island Motor Transit Co., 1951, 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391; United States v. Texas & Pacific Motor Transport Co., 1951, 340 U.S. 450, 71 S.Ct. 422, 95 L.Ed. 409; American President Lines, 1947, 7 C.A.B. 799. Although the Supreme Court cases involved certificates of public convenience and necessity, the principles announced therein are equally applicable where, as here, the Board grants letters of registration under the exemption provisions of § 1(2).

12. Air Freight Forwarder Case, 1948, 9 C.A.B. 473, 511. The phrase "will not be consistent with the public interest" is found in § 408(b).

13. 52 Stat. 973, 1024 (1938), 49 U.S.C.A. § 646(e); 60 Stat. 237, 243–4 (1946), 5 U.S.C.A. § 1009(e).

14. Air Freight Forwarder Case, 1948, 9 C.A.B. 473, 510–11. Subsequent to the CAB's order, the Erie Railroad acquired all the stock of the National Carloading Corporation. J.A., p. 117.

15. J.A., p. 112.

16. Appellant argues that "The provisions of the Civil Aeronautics Act do not confer upon the Board either the authority or the duty to attempt to equalize competitive advantages of indirect or direct air carriers." Brief for Appellant, p. 26. That the Board may consider the competitive impact of an applicant on the air transportation industry as one element of the public interest is obvious from the Act's declaration of policy, 52 Stat. 973, 980 (1938), 49 U.S.C.A. § 402 (d), and from the language of the first proviso of § 408(b), 52 Stat. 973, 1001–2 (1938), 49 U.S.C.A. § 488(b).

17. Securities & Exchange Commission v. Chenery Corp., 1947, 332 U.S. 194, 207, 67 S.Ct. 1575, 1582, 1760, 91 L.Ed. 1995; see also Securities & Exchange Commission v. Central-Illinois Securities Corp., 1949, 338 U.S. 96, 127, 69 S.Ct. 1377, 93 L.Ed. 1836; Federal Security Administrator v. Quaker Oats Co., 1943, 318 U.S. 218, 227–228, 63 S.Ct. 589, 87 L.Ed. 724.

The Board's opinion concluded that the facilities of the railroads, especially in the solicitation of traffic, might be used to Air Freight's advantage. In its petition for rehearing before the Board, Air Freight took considerable care to point out that neither National Carloading nor Air Freight will use the railroad's traffic solicitors. J.A., pp. 105, 106–7, 119.

the test. For similar reasons, we do not think the Board committed error when it found that the great fixed investment in railroad facilities not capable of use in air services would create an incentive to divert traffic to surface transportation. These are judgments which Congress entrusted to the Board when it wrote special provisions into the law governing applications by air carriers which are controlled by surface carriers. The record does not "clearly preclude the Board's decision from being justified by * * * its informed judgment on matters within its special competence * * *."[18]

We come finally to the argument that the Board acted arbitrarily and capriciously when it granted operating authority to other applicants, particularly to the Railway Express Agency, Inc.,[19] while denying authority to Air Freight. Petitioner points out that REA is also completely controlled by railroads.[20] And, it says, the Board failed to apply the same principles to Air Freight's application which it applied to REA. This failure, in Air Freight's view, resulted in the denial of its application and amounts to discriminatory treatment for which it is entitled to relief in this court.

The Board's action with respect to REA must be viewed in its entire context. REA has been carrying air express under contracts with the major airlines since 1929. With the passage of the Civil Aeronautics Act in 1938, these activities became subject to CAB regulation. In 1941, the CAB decided that REA was not entitled to a cer-

tificate of public convenience and necessity for these operations under the grandfather provisions of the Act.[21] At the same time, the Board concluded that the public interest required continuation of REA's air express operations, and it granted a temporary exemption under § 1(2) of the Civil Aeronautics Act. There was apparently no suggestion of a § 408 problem in this proceeding, for that section was not mentioned in the Board's opinion. In 1943, REA's contracts with the air carriers were revised at the Board's suggestion to eliminate certain features which it had found objectionable.[22] As more air carriers were certificated by the Board, REA entered into contracts with them.[23] At the time of the hearings below, REA operated under an exemption "subject to revocation * * * at any time if * * * the exemption * * * is no longer in the public interest."[24]

When the hearings were held in this case, REA was serving 23,000 communities by rail, motor or air connections. The air express division alone served some 880 communities in 1946. In the same year, REA handled 3,146,000 air shipments. At the hearing, many representatives of business interests testified to the public need for REA's services. And the airlines themselves, many of whom opposed the certification of air freight forwarders, joined in requesting that REA's air express operations be continued until the airlines as a group were ready to take over all air express operations. The record does not in-

---

This showing is undoubtedly one factor which we must consider on review, Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456. But even if the Board's conclusion with respect to traffic solicitors be incorrect we are unable to say, in view of the other findings, that the Board erred in denying Air Freight's application.

18. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456.

19. Hereafter referred to as REA.

20. REA's authorized capital stock, which consists of one thousand shares, has been distributed to seventy different rail-

roads whose respective holdings were determined by the amount of express business each conducted. Of REA's sixteen directors, fifteen have railroad affiliations. Air Freight Forwarder Case, 1948, 9 C.A.B. 473, 478.

21. Railway Express Agency, Grandfather Certificate, 1941, 2 C.A.B. 531.

22. Railway Express Agreements, 1943, 4 C.A.B. 157.

23. These contracts and future contracts which might be identical in terms were approved on September 3, 1946. Order Serial No. 5149.

24. Air Freight Forwarder Case, 1948, 9 C.A.B. 473, 479.

dicate that any other applicant sought to meet the public need for air express service which REA alone was supplying.

In the instant case, REA sought for its air express operations either a certificate of public convenience and necessity or an enlarged exemption order which could be revoked only by public hearing and findings. It also sought permission to engage in the air freight forwarding business, to handle air freight, and to enter into contracts with non-certificated carriers. One mark of the care with which the Board treated REA's application is its denial, at least temporarily, of all applications for permission to inaugurate service other than air express. And as to air express, the Board did nothing but continue the exemption under which REA has operated, with modification, since 1941.[25]

The CAB did not view the continuation of REA's air express service as raising a problem of compliance either with the letter or the policy of § 408 of the Civil Aeronautics Act. The key to the Board's opinion is its conclusion that Congress did not intend to make § 408 applicable to "a control relationship created prior to the effective date of the Civil Aeronautics Act and existing unchanged from that date forward."[26] This is a view which the Board has publicly held for at least eight years.[27] Appellants present us with no reason for holding this to be an in-correct interpretation of the statute. Indeed, they have not argued the point other than to assert that permitting REA to continue in the air express business while keeping Air Freight out of the air freight forwarding field was so arbitrary and capricious as to be discriminatory.

We believe the Board was correct in its view that § 408 has no effect where a control relationship in existence when the Civil Aeronautics Act was passed has continued unchanged. To suggest that "either there is or there is not" a congressional policy with respect to railroad control of air carriers is merely to pose the question, not answer it. Of course, there is such a policy. But the language of § 408 demonstrates that Congress intended that section to be prospective only—whether by way of technical application or by way of policy. In contrast, the language of §§ 409 and 412, which regulate such things as interlocking directorates and pooling agreements, indicates that, Congress intended to make those sections applicable to situations which existed at the time of the Act's passage or on the expiration of a specified number of days thereafter.[28] Had Congress intended either the words or the spirit of § 408 to apply to control relationships already established in 1938 and remaining unchanged thereafter, it could have easily said so.[29] Since Carloading's control of Air Freight was established subsequent to the passage

25. Id., at page 512.

26. Id. at page 485; Railroad Control of Northeast Airlines, 1943, 4 C.A.B. 379. In our view the reasons for the Board's conclusion that § 408 does not apply to REA are unmistakable from its opinion, especially in view of its citation of the Northeast Airlines case.

27. See id. at pages 385–387.

28. Section 409(a) prohibits certain interests without CAB approval, "After one hundred and eighty days after the effective date of this section * * *." Section 409(b) prohibits certain transactions "After this section takes effect * * *." 52 Stat. 973, 1002, 1003 (1938), 49 U.S. C.A. § 489. Section 412 provides: "Every air carrier shall file with the Board a true copy * * * of every contract or agreement * * * affecting air transportation and in force on the effec-tive date of this section or hereafter entered into, or any modification or cancelation thereof, 'between such air carrier and any other air carrier * * * for pooling or apportioning earnings, [etc.]. * * *

"The Board shall by order disapprove any such contract or agreement * * * that it finds to be adverse to the public interest, or in violation of this chapter * * *." 52 Stat. 973, 1004 (1938), as amended, 49 U.S.C.A. § 492.

29. "Retroactivity, even where permissible, is not favored, except upon the clearest mandate. It is the normal and usual function of legislation to discriminate between closed transactions and future ones or others pending but not completed." Claridge Apartments Co. v. Commissioner of Internal Revenue, 1944, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139.

of the Act, it is clear that the Board could not hold § 408 inapplicable to the Air Freight-Carloading relationship.[30]

While the Board felt that the relationship between REA and the railroads did "not raise any issue under section 408 of the Act," it should also be pointed out that the Board did consider whether "the railroad ownership of REA may have an adverse effect on the development of the air express potential and may be inconsistent with the public interest." The Board found that REA had "actively and consistently encouraged the solicitation and development of air express," had "joined with the [rail] carriers in authorizing the expenditure of large sums of money from gross air express revenues for advertising and promotional purposes" and that there was "nothing in the record to indicate that the railroads * * * have inhibited or restricted the air express operations to date."[31]

■ Considering all the factors which distinguish REA from Air Freight, we do not think the Board was arbitrary or discriminatory in its treatment of the two applicants. Treatment of REA was based upon a reasonable assessment of competing considerations. The Board, in a proper exercise of its expert judgment, weighed the acknowledged public need for air express service—which only REA was able to render—against the possibilities for abuse of the public interest resulting from REA's railroad control.

It is unnecessary to recite in great detail the CAB's treatment of the other applicants to dispel Air Freight's argument that the order is arbitrary and discriminatory. In granting applications, the CAB stated one or more factors which distinguished the applicant from Air Freight. In the case of applicants controlled by motor carriers, for example, the CAB found that the underlying motor carrier operated in a limited geographic area (New York, New England, the eastern United States), specialized in a particular type of service (household goods, fish, local pick-up and delivery service), or was so small as to create no real danger of a substantial conflict of interests between the motor carrying activities and the air freight forwarding activities. The CAB also found that the operations of motor carrier affiliates would be useful to the the applicants in bringing cargo to their consolidation points and in distributing shipments from break-bulk points. In treating applicants controlled by persons already engaged in phases of aeronautics, the Board granted the application only after finding that there would be no conflict of interest between the two phases of air activity. As an illustration, air freight forwarding authority was granted to one applicant only on the condition that the parent give up its air freight charter service. As a final example, in dealing with independent surface freight forwarders, the Board pointed out that they lacked the relatively high fixed investment in surface transportation facilities which created the incentive for

30. We find no confusion between the Board's conclusion in 1941 that REA was not entitled to a grandfather certificate, Railway Express Agency, Grandfather Certificate, 2 C.A.B. 531, and its conclusion that § 408 does not apply to REA's railroad control as presently constituted. In the grandfather case the Board decided only that one could not get a certificate under § 401(e), 52 Stat. 973, 988 (1938), 49 U.S.C.A. § 481(e), of the Civil Aeronautics Act, without showing actual physical operation of aircraft during the grandfather period.

This does not conflict with the Board's later holding that Congress intended neither the language nor the policy of § 408 to apply to surface—air carrier control relationships which remain unchanged since the Act's passage. The latter view does not, in our opinion, as the dissent argues, "bring it [REA] within the intendment of the Congress that a certificate be not denied because of REA's operations prior to the Act." In the first place, no one contends that the Board is without power to deny REA operating authority for any reason merely because § 408 does not apply to its control as presently constituted. In the second place, we are not dealing with a case where the degree of control exercised over REA has been increased since the Act's passage—be that increase ever so slight.

31. Air Freight Forwarder Case, 1948, 9 C.A.B. 473, 485.

diversion of air traffic in the case of railroad-controlled air freight forwarders.[32]

In conclusion, we think that the CAB's order merely expressed its view of the balance between the potentialities of abuse in Air Freight's control relationship and the public interest in having it enter a field for which there were many other applicants. "The appraisal of these numerous factors is for transportation experts. They may err. But the error, if any, is not of the egregious type which is within our reach on judicial review."[33] It is also our view that Air Freight's petition for reconsideration to the Board presented no facts which required the Board to reopen the case.

Affirmed.

PRETTYMAN, Circuit Judge (dissenting).

I would remand this case for further findings and conclusions by the Civil Aeronautics Board.

The case began with seventy-eight applications for certificates or exemptions by concerns seeking to do an air forwarding business, express or freight. The essence of the conclusion of the case is the continuation of a railroad-owned, one-company monopoly in the express forwarding business but the denial of National Air Freight's application for registration as a freight forwarder on the ground that its ownership by a railroad subsidiary might tend, despite some fifty-eight competitors, to influence it to attempt to divert air freight to its railroad parents.

The Board devoted thirty-four closely printed pages of its report to an elaboration of the principles which led it to grant the exemptions it granted, some fourteen of which pages were devoted to the railroad-owned monopoly of express forwarding and twelve pages to air freight forwarders generally, to some fifty-eight of which

freight forwarders it granted registration; but it gave less than a page to its discussion and denial of National Air Freight's application. My difficulty is that, when I apply to the facts respecting petitioners, as they are depicted to us, the principles so persuasively established in the Board's report, the opposite result to that reached by the Board appears inescapable.

It is our statutory duty to see that the Board is not arbitrary.[1] I cannot tell from the Board's report whether it has been arbitrary or not. Counsel now find bases for the grant of some registrations and the denial of this one, opposite results, but those bases ought to be found in the Board's report. The question is whether the Board was arbitrary, not whether its counsel are able to justify the result. That is the rationale of the opinions in Colorado-Wyoming Gas Co. v. Federal Power Comm.[2] and similar cases, as I read them.

The key consideration in the problem of railroad ownership of air carriers is the probability of a diversion of air traffic, or a lack of aggressiveness in developing air transportation. In that respect the Board said, as to the railroad-owned express monopoly, that there is nothing in the record to indicate that the railroads have inhibited or restricted air express operations to date, that the steady growth of air express provides convincing evidence that railroad ownership of the Railway Express Agency has not been inconsistent with the public interest, and that the Board will be in a position to take appropriate action if at any future time railroad control of REA should lead to conditions which are adverse to the public interest. In respect of National Air Freight, however, in its brief to us the Board says that it was entitled to base its judgment "on potentialities of future abuse", that "The Board did not find that National Carloading would not strive

---

32. Appellants also argue that the Board confused the facts concerning Air Freight's application with those of another railroad-controlled applicant. The opinion in our view evidences the Board's consideration of the differing circumstances presented by Air Freight.

33. New York v. United States, 1947, 331

U.S. 284, 331, 67 S.Ct. 1207, 1232, 91 L.Ed. 1492.

1. Sec. 10(e) (B) (1) of the Administrative Procedure Act, 60 Stat. 243 (1946), 5 U.S.C.A. § 1009(e) (B) (1).

2. 1945, 324 U.S. 626, 65 S.Ct. 850, 89 L. Ed. 1235.

whole-heartedly to develop air transportation through the use of National Air Freight * * *. The Board found only that petitioner National Air Freight, if granted operating authority, would have a competitive advantage which could be adverse to the development of air transportation * * *." If the railroads, having a monopoly in the forwarding of express, have done nothing to restrict the operation of air express, there appears to be no reason to suppose that they would restrict air freight. Common sense indicates that there should be no real competition between surface freight and air freight. The differences between the movements of railroad freight and air freight appear to be many and great, and the shipper who wished his goods to move by air freight but could be persuaded to have them moved by railroad freight would seem to me to be an infrequent customer. The two services are totally dissimilar. As a matter of fact, the Board made a pertinent comment upon this phase of the matter when it said in a part of its report not directed to petitioner:

> "The effect of air freight forwarder operations on the problem of diversion of cargo from air to surface transportation cannot now be determined. The shipper's problem is to get his merchandise from his own door to the door of the consignee at a speed and cost commensurate with the requirements of his particular needs. Convenience and dependability of service are other factors which influence his choice of carriers and each type of transportation offers its own peculiar advantages. Those products will go by air which demand quick delivery and can bear a high transportation cost. Much of this cargo business will not be subject to diversion from air to surface transportation but the total effect of air freight forwarder operations must await statistical information which can result only from actual operation."

Moreover, in the forwarding of air freight there will be some fifty competitors, whereas in the air express business there will be none. If the railroads should press for the shipment of express by rail instead of by air, the pressure would be effective, because their subsidiary is the only express forwarding agency. But, if the railroad controlling one out of fifty-some freight forwarders tried to divert air business to rail movement, it would seem to me that the other competing air freight forwarders, who offer the service the shipper wants, would very quickly take over the business. Diversion from one hand to the other of the same railroad-owned monopoly is one thing, but diversion in the face of a large group of active competitors is something else.

So it seems to me that, if the potential threat of a diversion of air express business is a matter merely for watchfulness and future control by the Board if the tendency toward diversion should occur, the same policy ought to apply to the air freight business. At any rate the Board's report does not show why one application should be treated one way and the other the opposite way, so far as this basic consideration is concerned.

As a matter of fact, the Board did apply the policy of watchful waiting in the cases of all the air freight forwarders except petitioners and two others. In respect to the threat of diversion by air freight forwarders generally, the Board made the following comments, among others, in addition to the comment already quoted:

> "* * * How much the services of the air freight forwarders will aid in the establishment of dependable air cargo service by reducing or eliminating delays due to faulty ground handling of cargo can be determined only upon the basis of actual operations.
> * * * * * *
> "* * * There are no statistical data available relating to actual air freight forwarder operations and many of the problems before us can be solved only on the basis of actual indirect air carrier operating experience of the type here proposed. * * *
> * * * * * *
> "Moreover, the competition of a large number of independent air freight forwarders will deter surface freight forwarders from diverting any

substantial amount of traffic from air to surface transportation. Finally, it would seem probable that with respect to most shipments, it will be the shipper, not the forwarder, who designates the means of transportation to be used."

Despite the absence of data, the Board granted four temporary letters of registration to surface freight forwarders, six to applicants related to surface forwarders, nine to applicants related to motor carriers, and thirty-four to applicants without railroad affiliations. Nevertheless, at the same time, the Board refused temporary registration to National Air Freight because of a possible conflict between its rail and its air interests, data or no data. In the one instance the Board found a potential "competitive advantage" an insuperable obstacle; in another it found an established complete monopoly no hindrance; and in others it found potential evil no bar to experimentation. There is not sufficient in the report, to my way of thinking, to indicate that these differences in treatment were not arbitrary. Certainly on the face of the record they would appear to be so. Without explanation, it would appear that data over a temporary period would be as desirable in respect to this applicant as the Board found it to be in respect to the others.

In respect to National Air Freight the Board tells us in its brief that it properly included the standards and policy of Section 408 of the Act in the criteria by which it determined whether it would be consistent with the public interest to grant the application. It said, in that respect, "Section 408 and its companion, Section 409 * * *, constitute an expression of congressional judgment that the possibility of conflicting interests between air carriers and surface carriers * * * represents a menace to the sound development of air transportation." But in its report, discussing the railroad-owned express monopoly, the Board said: "The relationship between REA and the railroads does not raise any issue under Section 408 * * *." Those two basic views on a point of major importance are confusing. The statement that an application for exemption by a railroad-owned corporation does not present "any issue" under Section 408 is surprising to me. Such an application might not come within the explicit terms of that Section, but there is the matter of the congressional policy reflected in the Section. Either there is or there is not such a policy.

I now digress a moment. I find myself, with the utmost respect, in disagreement with the opinions of the Second Circuit in Pan American Airways Co. v. Civil Aeronautics Board[3] concerning the application of Section 408 to a newly-created railroad subsidiary. The expression in Section 408 (a) (5), the pertinent subparagraph, is "acquire control", and the words in Section 408(b) are "consolidation, merger, purchase, lease; operating contract, or acquisition of control". The Act, broadly viewed in this respect, has three parts. It treats of applicants for certificates, Section 401 (d); these are not air carriers at the time but seek to be constituted carriers by an initial issuance of a certificate. Then the Act treats of the transfer of an outstanding certificate, Section 401(i), and then it treats of the transfer of the ownership of a concern which holds an outstanding certificate, Section 408. Viewed in this manner the Act is a coordinated whole. It treats of all three processes by which a concern may acquire a certificate. It seems to me that this integrated whole must be kept in mind when any one of the parts is being considered.

When a corporation sets up a wholly-owned subsidiary, it has not "acquired" anything, and the transaction is precisely the opposite of a consolidation or merger. The parent has only that which it already had, although in different form. Especially is it true that the parent has not at that point "acquired" an air carrier, because there is no air carrier at that time. When the subsidiary applies for and is granted a certificate, the transaction is an original issue, not a transfer. The only "acquisition" involved is an acquisition from the Board, which occurs in every certification. The

3. 1941, 121 F.2d 810.

transaction is precisely the same in substance as if the parent had applied for and received the certificate. I cannot bring myself to agree that, when a corporation sets up a wholly-owned subsidiary and the subsidiary applies for and is granted a certificate, the terms of Section 408, which deal with the acquisition of control of air carriers by others, apply. To apply those terms seems to me to be a wholly unnatural straining of legislative provisions.

At the same time it seems to me that, when the doctrines of the Rock Island[4] and Parker[5] cases are put together, the policy reflected in Section 408 applies to the original grant of certificates. The Rock Island case dealt with the corresponding sections of the Motor Carrier Act and held that those sections disclose a congressional policy precluding the ownership of motor carriers by rail carriers except under stated conditions, and that the Commission might apply that policy in its consideration of the public interest in applications for original certificates. The Parker case holds that established criteria for determining public convenience and necessity under certification provisions (in that case a motor carrier certificate) become statutory criteria and must be applied in all cases.

The sum of this phase of the case is, in my opinion, that, even if, contrary to the opinion in the Pan American case, supra, the terms of Section 408 do not apply to the creation of a wholly-owned subsidiary and its subsequent application for a certificate, nevertheless the policy of that Section must be included as one of the elements of the public interest in the consideration of the application under Section 401. So it is not clear to me what the Board meant to hold in the present case when it said that the application of a railroad subsidiary (speaking then of REA) for operating authority does not present any issue under Section 408. And the obscurity is increased when the Board tells us in its brief that even if the terms of Section 408 do not

apply to National Air Freight the policy does. I do not understand from the Board's report why the policy of Section 408 would apply to National Air Freight but would not apply to Railway Express.

The Board adopts the reasoning of the Pan American case, supra, and the court also adopts it. The court says that, if Section 408 does not apply to a newly-created subsidiary, "a common carrier seeking entry into the air transportation field would be able to evade § 408 merely by organizing a subsidiary and causing it to apply for a certificate of public convenience and necessity under § 401." At the same time the Board in its report, discussing the applications of surface forwarders in their own names, opens a paragraph by saying, "There remains only the question of the policy embodied in the so-called second proviso of section 408"; and then says, " * * * we are not bound to require compliance with its restrictive terms before granting authorization to engage in air transportation to a surface carrier which applies in its own name rather than through a subsidiary." The Board cites American President Lines Petition[6] as authority for the latter proposition. As I read that case it holds that the policy of Section 408 does apply to direct applications by surface carriers. However that may be, in the case at bar the Board concludes: " * * * we do not think we should apply it [i. e., the policy] where, as in the case of the four applicants here, there is no relationship which requires section 408 approval," meaning, apparently, that there are not two corporations involved. In the light of this rule as to direct applications by surface carriers themselves, I am unable to follow the reasoning used to support the necessity of applying Section 408 to a newly-acquired subsidiary. Why would a surface carrier seek to "evade" Section 408 by creating a subsidiary if Section 408 does not apply, either in terms or in policy, to an application filed in its own name in its own behalf? To my

---

4. United States v. Rock Island Co., 1951, 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391.

5. Interstate Commerce Comm. v. Parker, 1945, 326 U.S. 60, 65 S.Ct. 1490, 89 L. Ed. 2151.

6. 1947, 7 C.A.B. 799.

way of thinking, one or the other of these two propositions advanced by the Board must be wrong.

The explanation that Railway Express long ago established a monopoly in surface express forwarding and therefore must be granted a similar monopoly in air express forwarding appeals to me with less than conclusive force. The Board had the REA application before it in the present case. It was taking action on that application. It was not under compulsion to grant it.

The Board says that Section 408 does not apply to a control relationship established prior to the passage of the statute. That is true as to the terms of the Section. The terms are "It shall be unlawful * * For any * * * common carrier * * to acquire control of any air carrier * *." The quoted provision is a prospective expression. "To acquire" is an act, a transaction. Under the normal construction of statutes, a declaration of illegality applies only to transactions occurring after the passage of the statute. So this statute should apply to acts of acquisition occurring after its passage. I have no trouble with that proposition, but in the present case I encounter three other considerations. In the first place, when the Board comes to deal with a newly-created subsidiary, it holds that the act of certification is itself an acquisition. As the court phrases it, "the very process of certification brings the control relationships" within Section 408, and again: "* * * with completion of the certification process, there would be in existence an air-surface carrier control relationship which important segments of the Act were designed to regulate." If the certification process is an act of acquisition in the one case, I do not understand why it is not an act of acquisition in the other case. The Board says it should avoid retroactivity, but where a surface carrier owned an air carrier prior to the passage of the statute and, after passage of the statute, the air carrier applies for a certificate, certainly the latter event is subsequent to the statute, and so retroactivity is not involved if the

process of certification brings the control relationship within the ambit of the statute.

In the second place, the direct application of the terms of the Section is not the whole of its intended use. The policy of the Section applies even where its terms do not apply, and the Board says, at one point, that the policy applies in certification proceedings. If a carrier applied for a certificate after the statute was enacted, a consideration of the policy of the statute in respect of the certification does not involve retroactivity. The certification, the authority to act as an air carrier, is prospective. If Congress had said explicitly that no certificate should issue to a railroad-owned carrier, the provision would not be viewed as embodying a retroactivity. It would have applied to every certification proceeding regardless of pre-existing relationships, but nobody would have said that such a statute was retroactive. The same is true as to the application of a statutory policy to certification proceedings inaugurated after the passage of the statute.

In the third place, the so-called "grandfather clause", which is Section 401(e) (1) of the Act, seems to me to play a part in this phase of the problem. That Section provides that, if an applicant for a certificate, or its predecessor in interest, was an air carrier, continuously operating as such from May 14, 1938, it shall be entitled to a certificate. But the Board held, in a proceeding devoted to that question,[7] that the operations of Railway Express had not been of such nature as to entitle it to a certificate under that Section. Now, in the present case, the Board holds that those same operations are such as to prevent the application to REA of those policies of the statute which would otherwise be applicable to it in a certification or exemption proceeding. The two decisions are conflicting, as I see them. If REA's prior operations were not such as to support a grant, how can they be such as to preclude a denial? It seems to me that when Congress enacted Section 401 (e) (1), the grandfather clause, it defined the instances in which it intended prior

7. Railway Express Agency, Grandfather Certificate, 1941, 2 C.A.B. 531, 539 et seq.

operations to control the grant of a certificate. When the Board decided that that Section did not justify a certificate to REA, it thereby held that those prior operations were not within the operations intended by the Congress to overcome otherwise effective obstacles to the grant. In other words, it seems to me that in the two rulings the Board is saying that the prior operations of REA do not bring it within the intendment of Congress that a certificate be granted but do bring it within the intendment of the Congress that a certificate be not denied. The two rulings are confusing to me when considered together.

The court says that the Board has "publicly held" this position for eight years. The reference is to the fact that the Board made such a ruling eight years ago in a case (which incidentally is distinguishable on the facts) and nobody appealed it. This court has rarely felt impeded by such a circumstance, and I do not think it is a consideration here.

It is said that there are now no others to undertake the air express forwarding business. Of course are not, because up to now there has been an absolute monopoly in the Railway Express Agency. But if the field were open for air express forwarders one might suppose that ambitious concerns would crowd in.

Of course the grant to REA is not before us for review, but the contradictory results reached in this one opinion of the Board raise questions as to the validity of the result upon the application now before us.

The contradiction which disturbs me is not only between the principles recited by the Board as controlling in the case of REA and the result reached in the case of National Air Freight, but the contradiction also appears when the principles recited as applicable to the freight forwarders are considered. The Board pointed out, as I have already indicated, that data respecting the possible diversion of air freight to surface carriage is lacking and must be secured before the Board can tell whether it will occur. The Board emphasized the obvious differences between movement by surface freight and movement by air, and commented that the characteristics of the goods and the wishes of the shippers as to their delivery to the consignees will govern the choice of carriers. But, when the Board comes to explain in its brief to us its conclusion as to National Air Freight, it says that the potential threat, not demonstrated by experience, of diversion prevents a grant of even temporary registration, and that the policy of Section 408 prohibits registration. It allowed fifty-eight would-be freight forwarders a temporary experimental operation, but it refused three any opportunity to demonstrate the actualities.

The Board says that the owners of the three which were denied registration have substantial investments in surface carriage properties and that that fact would tend to make these three try harder to divert air freight. That view seems to me somewhat myopic. The important question is not the extent of the effort; it is the possible effectiveness of the effort, if any, and the controlling features of that effectiveness would seem to me to be the wide differences between air and surface movement of freight and the presence of fifty uninhibited competitors striving for air freight business. The effort of National Air Freight to get into the field would seem to me to be motivated by a desire for a large slice of this profitable new business, rather than a desire to divert some of this business to its rail movement. I would not, without proof, ascribe to the railroad-owner a course of Quixotic jousting, which is what its effort toward diversion in the face of this competition would be.

The court seems to stress the fact that National Carloading, immediate owner of National Air Freight, uses some of the facilities of "the railroads", especially office and warehouse space. "The railroads" in this connection include twenty roads other than the owner of National Carloading. Petitioners say that all the freight forwarders operate in the same manner in this respect, and there is certainly nothing in the record to suggest that National Carloading operates any differently from the others in the use of railroad warehouse and office space. If this is a point of difference it ought to be so found and clearly stated by the Board. As it is, I do not see how the

fact that National Carloading uses the facilities of twenty-one railroads, one of which is its owner, is a decisive factor in the temptation to divert. The owners of REA certainly own substantial properties, and the Board found as a fact that they did not try to divert from air carriage.

My brethren apply the rule that "only if it [the conclusion] lacks any rational and statutory foundation" can this court disturb it. But I do not think that rule applies in a case which involves more than one party and in which the administrative agency apparently treats one party one way and another the opposite way. Sometimes the evidence on a record as a whole is such that either of two opposite final results might be within the realm of reason. In such case either result is within the area of administrative expertise. But that does not mean that an administrative agency can validly reach one result in respect of one party and the opposite result in respect of another on the same record without rationalizing the difference. Rationalizing each result separately is not enough in such circumstances, it seems to me. The agency must show why and how it reached two different results, not merely how and why it reached each separate result independently of any consideration of the other.

This latter view is probably the crux of my disagreement with my brethren. If REA were a case alone, by itself, and there were no other similar cases, I could understand the conclusion. If National Air Freight were a case by itself and of first impression, there being no other similar cases and no prior contrary holdings, I might consider the result within the realm of expert reason. And so with respect to the other freight forwarders. But we do not have that situation. We have an opinion and order which lays down persuasive principles, explains with exhaustive precision the application of those principles to one party, explains with somewhat less volume the application to other parties, and then without any substantial explanation announces the opposite result in respect to these petitioners and two others. Our functions as a court are very limited in these cases. But we have one clear mandate, and

that is to guarantee that agency action is not arbitrary. That does not mean personal or official malice or bad feeling. It means legal arbitrariness, and that, in its simplest terms, includes the treatment of one person one way and another person another way without a reasonable justification for the difference. On the record before us I cannot find in the Board's explanation or justification a rational basis for the opposite results reached. So I cannot tell whether that difference was or was not arbitrary, legally speaking.

I would require the Board to make further findings and conclusions, to demonstrate whether its denial of this application was arbitrary in the light of all else that it said and did in this opinion and order.