**CONTINENTAL SOUTHERN LINES, Inc., v. CIVIL AERONAUTICS BOARD et al. (two cases).**

**Nos. 10811, 10812.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 5, 1951.

Decided April 17, 1952.

Prettyman, Circuit Judge, dissented in part.

Jerrold Scoutt, Jr., Washington, D. C., with whom A. L. Wheeler, Washington, D. C., was on the brief, for petitioner.

James L. Highsaw, Jr., Attorney, Civil Aeronautics Board, Washington, D. C., pro hac vice, by special leave of Court, with whom Asst. Atty. Gen., H. G. Morison, and Emory T. Nunneley, Jr., General Counsel, Civil Aeronautics Board, John H. Wanner, Associate General Counsel, Civil Aeronautics Board, and O. D. Ozment, Attorney, Civil Aeronautics Board, all of Washington, D. C., were on the brief, for respondent. Charles H. Weston, Attorney, Department of Justice, and Warren L. Sharfman, Attorney, Civil Aeronautics Board, Washington, D. C., also entered appearances for respondent.

James W. Batchelor, Washington, D. C., with whom L. Alton Denslow, Washington, D. C., was on the brief, for intervenor Ozark Airlines, Inc.

Cecil A. Beasley, Jr., Washington, D. C., with whom Eugene B. Thomas, Jr., Washington, D. C., was on the brief, for intervenor Southern Airways, Inc.

Before PRETTYMAN, PROCTOR and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

For nearly six years, the Civil Aeronautics Board has been trying to establish feeder air service in two important areas of the United States. These appeals mark the

most recent skirmish in what has been a protracted administrative and judicial struggle. The order under attack in No. 10811, the Parks Investigation Case,[1] awarded routes lying generally within an area bounded by Tulsa, Memphis, Indianapolis, Chicago and Kansas City. No. 10812, the Reopened Mississippi Valley and Southeastern States Cases,[2] involves routes lying generally between Memphis and New Orleans.

### Background of the Parks Case

As long ago as 1946, the Board found that some of the routes involved in the Parks case were required by the public convenience and necessity.[3] Parks was awarded a certificate in 1948.[4] A year later, Parks had not yet succeeded in establishing service.[5] After an additional 102 day trial period, the Board called for further hearings to determine whether the public interest required that Parks' certificate cease to be effective and that the routes be awarded to another applicant.[6] During these proceedings, Parks made several representations that it had become financially able and willing to initiate service over the entire route pattern.[7] The Board found, however, that Parks had had ample opportunity to activate the routes, that it was unconvinced by Parks' new offerings on the matter, and that further hearings would be necessary before a determination could be made as to whether Parks actually had sufficient available capital.[8] Stressing the long delays which had already occurred, the need for early service and the large investments which communities and state and federal agencies had made for airports,[9] the Board ordered that the Parks' certificate "cease to be effective" and selected another carrier to operate the routes involved in this appeal.[10]

### Background of the Reopened Valley Case

Although the delays in the Reopened Valley case are of a different origin, they are no less exasperating from the point of view of the public need for immediate air service. Routes in the Reopened Valley area were originally involved in two separate cases before the Board.[11] When the Board learned in the first of these cases that routes in Mississippi, Alabama and Georgia were also sought in the second case, it deferred decision on these routes until the second case had been heard. The applicant ultimately selected by the Board in the second case had not actually applied for all of the routes which it was awarded. As a result, to avoid any prejudice to other applicants, the Board ordered the two cases consolidated for reconsideration in the Reopened Valley case.[12] As the Board pointed out in the opinion issued on reconsideration, the delays had been unavoidable.[13] Nevertheless, it felt that they could not be ignored since even the opinion in the second of the two consolidated cases was three years old before the routes were finally awarded to the present operator.[14]

### Continental's Surface Carrier Relationships

Thus, under the circumstances of a pressing need for immediate service in both areas, the Board had to select applicants who could inaugurate air service with dispatch. From the opinions and examiners' reports in the Reopened Valley and Parks

1. C.A.B. Docket No. 3965, et al., decided July 28, 1950. Hereafter referred to as Parks.

2. C.A.B. Docket Nos. 548 and 501, et al., decided July 28, 1950. Hereafter referred to as Reopened Valley.

3. J.A., p. 237.

4. Id. at p. 238.

5. Ibid.

6. Id. at p. 26.

7. Id. at pp. 239–41.

8. Id. at p. 242.

9. Id. at p. 240.

10. Id. at p. 260.

11. Mississippi Valley Case, 8 C.A.B. 726 (1947); Southeastern States Case, 7 C.A.B. 863, 892 (1947).

12. These developments are set out in the Reopened Valley opinion. J.A., p. 708, n. 1. The order reopening the cases appears id. at p. 427.

13. J.A., p. 726.

14. Actual proceedings with respect to the Reopened Valley areas commenced in 1945. J.A., p. 554.

cases, it appears that Continental Southern Lines, Inc.,[15] petitioner herein, was the only applicant who was also a surface carrier. This fact alone would have prevented the Board from certificating Continental unless there was a reasonable likelihood that Continental would be able to comply with the special standards which Congress has said are to govern surface carrier participation in air transportation.[16]

Moreover, while these proceedings were under way, Continental took a step which ultimately raised even greater obstacles to its certification. On December 22, 1948, well before the hearings in either the Reopened Valley or Parks cases, Continental made a contract which obligated Transcontinental Bus System, Inc.,[17] an operating and holding company, to purchase all of Continental's stock.[18] With the approval of this agreement by the Interstate Commerce Commission on August 19, 1949, Continental became part of a great surface transportation empire whose affiliated routes stretch from Portland, Oregon to Los Angeles and Chicago. This stock purchase, in the CAB's view, was an acquisition of an air carrier by a surface carrier and therefore was illegal unless approved by the Board under § 408 of the Civil Aeronautics Act. We have recently held this to be a sound interpretation of the Act, since an applicant for a certificate (Continental here) is considered an air carrier.[19]

## The § 408 Problem

■ The pertinent portions of § 408(b) of the Civil Aeronautics Act forbid the Board to approve acquisitions of control prohibited in § 408(a) unless the Board "finds that the transaction proposed will promote the public interest by enabling such carrier other than an air carrier to use aircraft to public advantage in its operation and will not restrain competition." Although it would not have been necessary for the Board to issue an order under § 408 approving the control relationship before it issued a certificate of public convenience and necessity,[20] it does not follow that the Board would have had to certificate Continental in the face of a finding that it was unlikely that it could satisfy the subsequent § 408 procedure. This is true because "all the policies of a regulatory statute become elements of the public interest to be weighed in a certification proceeding."[21]

Continental does argue, however, that even if a § 408 order is ultimately necessary, it has made a showing of probable compliance with that section and therefore the Board should have certificated it under § 401, 49 U.S.C.A. § 481, pending the outcome of § 408 proceedings.[22] We must turn, then, to an examination of the record in order to ascertain if it supports the Board's contrary findings that "it is apparent on the face of the situation that the § 408 proceeding would involve substantial questions and that there is serious doubt as to whether or not the control of Continental Southern by Transcontinental could legally be approved."[23]

The record, in our view, sustains the Board's findings. Even though one were to regard the record as adequate to show compliance with § 408 so long as only Continental itself was in the picture,[24] an entirely

15. Hereafter referred to as Continental. When these proceedings were opened, Continental was known as Southern Bus Lines, Inc., J.A., pp. 31, 549.

16. These standards are set forth with particularity in § 408(b) of the Civil Aeronautics Act, 52 Stat. 973, 1001 (1938), as amended, 49 U.S.C.A. § 488 (b).

17. Hereafter referred to as Transcontinental.

18. J. A., p. 401.

19. National Air Freight Forwarding Corp. v. Civil Aeronautics Board, D.C.Cir., 197 F.2d 384, and cases cited therein.

20. Pan American Airways Co. v. Civil Aeronautics Board, 2 Cir., 1941, 121 F.2d 810.

21. National Air Freight Forwarding Corp. v. Civil Aeronautics Board, supra.

22. Reply Brief for Petitioner, p. 8.

23. J.A., p. 249.

24. Continental's proof in both the Reopened Valley and Parks cases was de-

new case of major proportions was presented by the entrance of Transcontinental.

With respect to that case—Continental owned entirely by Transcontinental—the applicant failed to make a record upon which the Board could either decide the § 408 issue or determine whether there was a reasonable likelihood that its standards could be met. For example, there are no exhibits of Transcontinental's existing bus schedules, no schedules showing possible coordination between Transcontinental's existing surface transportation and future air operations, no exhibits of existing rates or proposed future air rates, and no proposed possible joint air-surface rates. The Board announced in advance of the hearings of the Parks case that data of this nature should be submitted where a § 408 problem existed.[25]

It is true that the record contains general references to the desirability of integrating Continental's air services with Transcontinental's bus operations, and evidence that management of the two enterprises would be coordinated to some extent.[26] The adequacy of such reference is

questionable, however, when, as here, one witness who spoke of integration admitted that he had not studied "in too much detail" "the coordination between the Transcontinental Bus Line routes and the routes proposed in the area"[27] and another stated that he was "not familiar with the surface carrier operations of Southern Bus Lines and its affiliated companies,"[28] and that the applicant's cost and income estimates did not take into account the effect, if any, which integrated operations would have.[29] Nor does it appear from the record to what extent it would be possible to maintain joint advertising, ticket sales, property protection and maintenance and the like between an air line operating in a few Midwestern states and a bus system whose routes blanket one fourth of the nation. Moreover, it should be noted that the Board had nothing before it on which it could determine whether Transcontinental itself was controlled by any surface carriers.[30]

In light of so bare a record, we can hardly insist that the Board should have found it likely that, in the words of § 408(b), Transcontinental's acquisition of Continen-

voted primarily to showing that the proposed air operations of Continental would meet the restrictive standards of the second proviso of § 408(b) when that proviso was applied to Continental itself. Thus, for example, the record reveals proposed specimen integrated air-bus time schedules on Continental's routes (J.A., pp. 217, 218, 226; cf. J.A., pp. 478-9), and proposals for joint facilities for sale of tickets (J.A., pp. 226, 478), joint advertising (J.A., pp. 226, 479), and joint property protection and, to some extent, use of joint shop facilities (J.A., p. 226).

25. J.A., p. 36.

26. J.A., pp. 200, 201, 202.

27. J.A., p. 201.

28. J.A., p. 212.

29. J.A., pp. 208, 212. This same witness stated that "The second advantage, which would be actual integration of schedules, would result from an over-all connecting service *in the region between Southern Air Lines and Southern Bus.* J.A., p. 210. (Emphasis supplied.)

30. Southern Airways, Inc., the success-

ful applicant in Reopened Valley and intervenor in this court, attached to its brief before the Board a chart purporting to show that the Santa Fe Railway owns indirectly 38% of Transcontinental's stock and that the Dixie Motor Coach Corporation owns 26% of Transcontinental's stock. J.A., p. 519. When Continental attempted to introduce an affidavit in oral argument before the Board concerning control of Transcontinental, its motion was denied. Member Lee suggested that the situation might call for a motion to reopen the proceeding. Counsel for Continental replied that they thought the Board should defer decision on control of Transcontinental until the Board passed on Continental's then pending application for § 408 approval. J.A., pp. 550-4.

The Board does not suggest that the problem of ownership of Transcontinental's stock was responsible for its decision not to allow a § 408 proceeding, but obviously the Board could not come to any final decision on the § 408 problems until it had explored the possibility that Transcontinental itself was controlled by other surface carriers.

tal "will promote the public interest by enabling [Transcontinental] to use aircraft to public advantage in its operation and will not restrain competition." With Transcontinental in the picture, it is not unfair to say that Continental's proposal looked like an attempt to add a very big dog to a very small tail. We do not think the Board was required, in effect, to license the dog without knowing how serious would be its bite.

While the CAB recognized that it had power to certificate Continental under § 401 despite the § 408 problems if the public interest so required,[31] it found, in view of all the circumstances here, that certification of this applicant would be against the public interest. The Board carefully pointed out that the record contained no assurance that Transcontinental would be willing to divest itself of Continental if the Board should so order as the result of a § 408 case. If it should be unwilling to do so, then, as the Board stated, all the administrative proceedings to date would have been for naught and it would become necessary to seek another applicant. With so many foreseeable obstacles in Continental's path to ultimate approval, it was reasonable for the Board to question the willingness of Continental to risk the substantial investments necessary for the immediate activation of the routes.

■ It should be noted that there is no question of surprise here. Continental had long been aware of the delays in these cases which made immediate institution of service so important. It had been an applicant in the proceedings which led to the Reopened Valley case, at least a year before its 1948 stock purchase contract with Transcontinental. And, the pre-hearing examiner in the Parks case had put the parties on notice that § 408 issues would be covered in that proceeding.[32] Nevertheless, despite the fact that almost a year passed between the time when the I.C.C. approved Transcontinental's purchase of Continental[33] and the rendering of a decision by the CAB, Continental did not make a record sufficient to meet § 408 problems under the new state of facts. Nor was any attempt made at any time to consolidate the § 401 and § 408 issues for simultaneous determination.[34] It was apparently Continental's view that it had built an adequate record and that any loose ends could be tied together in the § 408 proceeding which would follow certification.[35] As we have said, however, the Board properly concluded that an adequate record had not been presented.

*Decision under § 401*

■ In determining under § 401 whether an "applicant is fit, willing, and able" and that the service sought "is required by the public convenience and necessity", the Board must weigh all the criteria found in the Act which give substance and vitality to the congressional mandate of policy set forth in § 2 of the Act, 49 U.S.C.A. § 402.[36] These widely ranged factors were considered by the Board in this case in the light of a long history of CAB effort to provide feeder service in the Parks and Reopened Valley areas: the pressing need for early service, the substantial probability of added delays and the uncertainties in connection with the certification of Continental. We think the Board properly concluded therefrom that it could not find that "the public interest requires

---

31. J.A., p. 250; American President Lines Petition, 7 C.A.B. 799, 804 (1947).

32. J.A., pp. 36–7.

33. The stock purchase was approved by the Interstate Commerce Commission on August 19, 1949. J.A., p. 401. The hearing examiner's report in Reopened Valley was filed on November 25, 1949, J.A., p. 15; in Parks, on April 21, 1950, J.A., p. 4.

34. When Continental finally did ask for approval of its control relationship, on March 7, 1950, it requested that its application "be promptly assigned for hearing * * * *provided [it] is awarded a certificate of public convenience and necessity * * * *." J.A., p. 401. (Emphasis supplied.)

35. J.A., pp. 232, 578.

36. Cf., Scripps Howard Radio, Inc., v. Federal Communications Commission, D.C.Cir., 189 F.2d 677 (1951), certiorari denied, 1951, 342 U.S. 830, 72 S.Ct. 55.

service over any of the Parks routes by Continental Southern regardless of the circumstance that it is a surface carrier." [37] Having correctly decided that under all the circumstances Continental could not furnish the immediate service which the public convenience and necessity required, the Board was not compelled to decide whether Continental was otherwise more fit, willing and able than the other applicants. Hence we need not consider Continental's challenge of the Board's findings on the qualifications of the successful applicants. [38]

*Petition for Transfer*

Continental makes the further argument that the Board should have granted its application to have any certificates that might be issued to it transferred to Transcontinental. The resulting relationship, it says, would have been that of an air carrier controlling a surface carrier—something which § 408(a), when literally read, does not prohibit—instead of a surface carrier controlling an air carrier, which is clearly prohibited. There would then be no necessity for a § 408 proceeding and hence no additional procedural delays.

 There are several fallacies in this argument, but we need point out only one.

Even if the necessity for actual proceedings under § 408 could be avoided by the device suggested, a result we seriously question, [39] the transfer could not be approved unless the Board thought it in the public interest. [40] And the concept of "public interest" for the purposes of a transfer is just as broad as "public interest" in an original certification proceeding. In both cases, it includes the policies and standards of § 408(b). [41] What we have already said about the record establishes that Continental failed to convince the Board that the transfer would have been in the public interest. Under these circumstances, the Board properly denied the petition for transfer.

We hold that the Board's order denying certificates in both the Parks and Reopened Valley cases was valid and that Continental's petition for transfer of its application to Transcontinental was properly denied.

Affirmed.

PRETTYMAN, Circuit Judge.

I concur in the result and also concur in the opinion except in so far as it involves matters discussed in my dissent in National Air Freight Forwarding Corp. v. Civil Aeronautics Board, D.C.Cir., 197 F.2d 384.

37. J.A., p. 250. American President Lines Petition, 7 C.A.B. 799, 804 (1947).

38. Simmons v. Federal Communications Commission, 1944, 79 U.S. App.D.C. 264, 145 F.2d 578.

39. We do not think that the CAB cases cited by petitioner stand for the proposition urged here—that if a technical § 408 (a) relationship existed before a motion for transfer was filed, the necessity for § 408 proceedings could be dispensed with by granting the motion.

40. Section 401(i) of the Civil Aeronautics Act reads: "No certificate may be trans-

ferred unless such transfer is approved by the Board as being consistent with the public interest." 52 Stat. 973, 989 (1938), as amended, 49 U.S.C.A. § 481(i). The concept "public interest" is broad enough to enable the Board to consider whether a transfer would be likely to result in a violation of the policies of § 408(b). See our decision in National Air Freight Forwarding Corp. v. Civil Aeronautics Board, D.C.Cir., 197 F.2d 384, decided April 10, 1952.

41. National Air Freight Forwarding Corp. v. Civil Aeronautics Board, supra.