PAN AMERICAN AIRWAYS CO. v. CIVIL AERONAUTICS BOARD et al.

No. 266.

Circuit Court of Appeals, Second Circuit.

July 16, 1941.

Root, Clark, Buckner & Ballantine, of New York City (Henry J. Friendly and Richard E. Manning, both of New York City, of counsel), for petitioner Pan American Airways Co.

Francis M. Shea, Asst. Atty. Gen., and L. Welch Pogue, Gen. Counsel, Civil Aeronautics Board, of Washington, D. C., (Sidney J. Kaplan, Asst. to the Atty. Gen., and Martin Norr, Sp. Atty., Department of Justice, George C. Neal, Asst. Gen. Counsel, Civil Aeronautics Board, John G. Sarber, Associate Atty., Civil Aeronautics Board and Robert W. Oliver, Senior Atty., Civil Aeronautics Board, all of Washington, D. C., of counsel), for respondent Civil Aeronautics Board.

Chadbourne, Wallace, Parke & Whiteside, of New York City (Gerald B. Brophy, Charles Pickett, and Carl S. Rowe, all of New York City, of counsel), for respondent American Export Airlines, Inc.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The petitioner, Pan American Airways Company (hereafter called Pan American), is engaged in the transportation of persons, property and mail by air across the Atlantic. Its operations are conducted under a certificate of public convenience and necessity issued by the Civil Aeronautics Board. American Export Airlines, Inc. (hereafter called Export), organized in 1937 as a subsidiary of American Export Lines, Inc., a common carrier by water, filed an application with the Board on May 9, 1939, for a certificate permitting it to engage in the transportation of property and mail between the United States and France. Shortly before October 30, 1939, the date set for the hearing, Export filed an amendment to its application in which it sought permanent certificates for transportation of passengers as well as property and mail to France and to Ireland and England, and likewise a temporary certificate for transportation to France, by way of the Azores and Lisbon, Portugal, of property and mail only. On October 24, 1939, Pan American filed a petition for leave to intervene in Export's proceeding to obtain certificates, which was granted by the Board. On October 23, 1939, Export filed an additional application with the Board pursuant to Section 408 of the Civil Aeronautics Act asking for approval of the control of Export by American Export Lines, Inc., if such approval should be deemed necessary. This application was consolidated with the other applications of Export to obtain certificates of convenience and necessity and the applications were thereafter heard together.

Shortly after the hearings began Congress enacted the Neutrality Act of 1939, 22 U.S. C.A. § 245j to 245j—19, making it illegal for American citizens to carry on air transportation to France and England, and the President made a proclamation defining combat areas which made it also unlawful to carry on air transportation to Ireland. On November 10, 1939, Export filed a second amendment to its application for certificates and therein asked for a temporary certificate for the transportation of passengers, property and mail by Route 4 between the United States and Rome, Italy, via Lisbon, Portugal, and Barcelona; and for the transportation of mail and property by Route 5 to the same points with, however, an additional stop at the Azores. Hearings were conducted before the Board up to January 10, 1940. On July 12, 1940, the latter rendered a decision dismissing the applications for permanent certificates of transportation to Ireland and England and France, but without prejudice to the right to have the applications reconsidered "when the present legal barriers of operation to those countries are removed." The applications for temporary certificates for transportation of passengers, property and mail so far as they related to Spain and Italy were denied, but the two applications for temporary certificates in so far as they related to service to

Lisbon, Portugal, were granted. The one issued under the application for Route 4 was to remain in effect "for such time as the conduct of the operations to France, England, Ireland and Italy, or to any one or more of such states, shall be rendered unlawful by reason of a proclamation or proclamations issued pursuant to the provisions of the Neutrality Act of 1939, or any act amendatory thereto, and for sixty days after such proclamation or proclamations shall have ceased to render the conduct of such operations unlawful", and thereafter pending action on any application for alteration, amendment or modification of the certificates. The certificate issued under the application for Route 5 was to terminate September 1, 1941.

The Board dismissed the application of Export filed under Section 408 for approval of acquisition of control by American Export Lines, Inc., on the ground that no approval of acquisition of control by the steamship company was required.

On July 30, 1940, the petitioner filed a petition for a rehearing which questioned the correctness of the dismissal of the application under Section 408 and likewise the findings of the Board relating to public convenience and necessity on which the temporary certificates for Routes 4 and 5 were based because the findings were made under conditions essentially different from those existing after the invasion of the Low Countries, the entrance of Italy into the war and the fall of France. The petition for rehearing likewise laid stress upon the decline of American trade in continental Europe, decreases in rail and passenger movements and the effect of the war upon Pan American traffic to show that no further means of transportation by air were needed. A rehearing was denied by the Board on August 14, 1940. Pan American thereupon filed the present petition (1) to review the order of the Board dated July 12, 1940, granting the application of Export for temporary certificates in so far as they related to service to Lisbon, Portugal, and dismissing its application for approval of control by American Export Lines, Inc., and (2) to review the order of the Board dated August 14, 1940, denying the motion of Pan American for a rehearing.

The Board moved to dismiss, for lack of jurisdiction, the petition of Pan American to review (1) the order of the Board dated July 12, 1940, granting the application of Export for certificates of convenience and necessity, under Section 401, to the extent of issuing temporary certificates for transportation between the United States and Portugal, and dismissing the application of Export, under Section 408, for approval of the acquisition of control of Export by its parent American Export Lines, Inc., and (2) the order of the Board dated August 14, 1940, denying a petition for rehearing made by Pan American.

The temporary certificates granted were approved by the President, as was the order for the same.

■ The petition for review was filed under Section 1006(a) of the Act, 49 U.S. C.A. § 646(a), which reads as follows: "Sec. 1006 [§ 646]. (a). Any order, affirmative or negative, issued by the Authority under this Act [chapter], except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 801, [601] of this Act [chapter], shall be subject to review by the circuit courts of appeals of the United States * * * upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. * * *"

Section 1006(a) would on its face seem to make the orders of July 12 and August 14, 1940, appealable. Pan American, as the only American carrier engaged in foreign air transportation, had a substantial interest in the issue of a certificate because it would be adversely affected by the diversion of traffic to a prospective competitor. Texas & Pac. Ry. Co. v. Gulf, etc., R. Co., 270 U.S. 266, 277, 46 S.Ct. 263, 70 L.Ed. 578; Federal Communications Commission v. Sanders Bros. Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693, 84 L.Ed. 1037. Moreover, the orders did not fall within the exception in Section 1006(a) limited as the exception is to a "foreign air carrier" which, under Section 1 (19), 49 U.S.C.A. § 401 (19), "means any person, not a citizen of the United States, who undertakes, whether directly or indirectly * * * to engage in foreign air transportation."

But it does not follow merely from the broad language of Section 1006(a) that there may be a review of orders for the issuance of certificates which the President shall approve or disapprove under Section 801, 49 U.S.C.A. § 601. That section provides in part that: "The issuance, denial, transfer, amendment, cancelation, suspension, or revocation of, and the terms, conditions, and limitations contained in, any

certificate authorizing an air carrier to engage in overseas or foreign air transportation, or air transportation between places in the same Territory or possession, or any permit issuable to any foreign air carrier under section 402 [482], shall be subject to the approval of the President."

Subject to the approval of the President required by Section 801, certificates of public convenience and necessity are issuable under subdivisions (d) (1) and (2) of Section 401, which read as follows:

"(1) The Authority shall issue a certificate authorizing the whole or any part of the transportation covered by the application, if it finds that the applicant is fit, willing, and able to perform such transportation properly, and to conform to the provisions of this Act [chapter] and the rules, regulations, and requirements of the Authority hereunder, and that such transportation is required by the public convenience and necessity; otherwise such application shall be denied.

"(2) In the case of an application for a certificate to engage in temporary air transportation, the Authority may issue a certificate authorizing the whole or any part thereof for such limited periods as may be required by the public convenience and necessity, if it finds that the applicant is fit, willing, and able properly to perform such transportation and to conform to the provisions of this Act [chapter] and the rules, regulations, and requirements of the Authority hereunder."

■ It seems clear that in approving or disapproving of certificates of public convenience and necessity the President must frequently act on information which was not before the Board and may even have become available to him after the Board has taken its testimony and granted the certificates. There is nothing in the act to show that in granting certificates of public convenience and necessity the Board is acting as anything more than the President's adviser. His necessary approval or disapproval makes him, and not the Board, the ultimate arbiter. United States v. George S. Bush & Co., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259.

■ If the President has approved of a certificate authorizing a carrier to engage in foreign air transportation and we should attempt to review the order authorizing the issuance of the certificate, we would be placed in a position where we

might be obliged to reverse a tribunal whose subsequent action the President would decline to approve. His sweeping powers are illustrated by the fact that under Section 801 he is obliged not only to approve or disapprove of a certificate for foreign air transportation, but even to approve or disapprove of the denial of such a certificate by the Board. It seems incredible that in enacting Section 1006(a) Congress intended to permit a review of the action of the Board in cases where the constitutional authority of the President to negotiate with foreign nations and to proceed upon confidential and other information at his disposal and his statutory duty under Section 801 to approve or disapprove of certificates, and even of the denial of them, would necessarily render our review futile. United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134; United States v. Curtiss-Wright Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255. The review of the order authorizing the issuance of the certificates is so dependent upon considerations resting in Executive discretion that it cannot be regarded as authorized by Section 1006(a). Accordingly the motion to dismiss the appeal is granted as to such part of the order of July 12, 1940, as authorized the issuance of the temporary certificates.

■ It is unnecessary for us to consider whether the clauses in the certificate for Route 4 authorizing Export to stop at Bermuda and the Azores, and in the certificate for Route 5, to stop at Bermuda "if and when required by weather conditions" resulted in the denial of a hearing because they imported a right to engage in commercial traffic to points not covered by the applications. As we read the certificates no such right was given. The stoppage is expressly limited by the requirements of "weather conditions" and permits no taking on or discharging of passengers, freight or mail at those points for commercial purposes. Such acts would have to be authorized by an exemption order under Section 416(b), 49 U.S.C.A. § 496(b), or by a certificate granted in the usual form.

■ There only remains for consideration the review of that portion of the order of July 12, 1940, which dismissed the application of Export under Section 408 for approval of the acquisition of Export by its parent American Export Lines and the review of the order of August 14, 1940,

denying the application for a rehearing. A review of these may be had by virtue of Section 1006(a). Their validity depends, in the case of the order dismissing the application under Section 408, upon questions in which the discretion of the President is not involved and, in the case of the order denying a rehearing, upon the adequacy of the hearing already given.

### Application under Section 408.

■ Section 408(a) of the Civil Aeronautics Act provides that:

"It shall be unlawful, unless approved by order of the Authority as provided in this section * * *

"(5) For any air carrier or person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to acquire control of any air carrier in any manner whatsoever."

American Export Lines was a common carrier and owned seventy per cent of the stock of Export and the latter proposed to engage in business as an air carrier but was not an air carrier when it filed its application with the Board asking for approval of the control of Export by American Export Lines if such approval were deemed necessary. The Board, with one of its members dissenting, dismissed the application upon the ground that Section 408(a) (5) "applies to cases involving the control of air carriers only where the acquisition of control of a corporate entity occurs at a time when that entity is already an air carrier." This seems to us an unduly literal interpretation of subdivision (5). In our opinion "to acquire control of any air carrier in any manner whatsoever" is to take all steps involved in obtaining control, which in this case would consist in supplying a subsidiary corporation, organized for air carriage and possessing adequate financial resources, with a certificate authorizing operation. Any other interpretation would enable a steamship company, by organizing a subsidiary for air carriage, to escape the requirement of Section 408(b) that the "Authority shall not enter * * * an order of approval unless it finds that the transaction proposed will promote the public interest by enabling such carrier other than an air carrier to use aircraft to public advantage in its operation and will not restrain competition."

■■ Here the Board found "that applicant will be fit, willing, and able properly to perform the air transportation for which certificates are to be issued herein, and to conform to the provisions of the Act and to the rules, regulations, and requirements of the Board thereunder, and that such air transportation is required by the public convenience and necessity, regardless of whether or not applicant continues in its present relationship to its parent company, American Export Lines, Inc., or becomes an independent company."

Counsel for Pan American argue that the Board erred in issuing certificates to Export for foreign air transportation, when the latter was under the control of a steamship corporation, in the absence of a showing that the public interest would be promoted by enabling the parent company to use aircraft in its operations. This contention is based upon the supposed effect of decisions of the Interstate Commerce Commission in cases arising under the Motor Carrier Act. Section 213(a) (1) of that Act, 49 U.S.C.A. § 313(a) (1), from which Section 408(b) of the Civil Aeronautics Act seems to have been derived, relates to applications for acquisition of control of a motor carrier by a railroad or other carrier, and provides: "That if a carrier other than a motor carrier is an applicant, * * * the Commission shall not enter such an order unless it finds that the transaction proposed will promote the public interest by enabling such carrier other than a motor carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition."

Not only the terms of Section 213(a) (1) of the Motor Carrier Act, but the decisions of the Interstate Commerce Commission show that a railroad or any carrier other than a motor carrier is not permitted to acquire control of the latter's operations without proof that the result will enable the other carrier to use service by motor vehicle in its own operations. See Greyhound Mergers, 1936, 1 M.C.C. 342. It is argued from this that the power to issue a certificate of public convenience and necessity in a case like the present was dependent not only upon proof that the public interest would be promoted thereby but that the steamship company might use air carriage by Export in its own operations. The decisions of the Interstate Commerce Commission under the

Motor Carrier Act involve no such conclusion. In Missouri Pac. Transp. Co. Extension of Operations, 9 M.C.C. 712, 717, the Commission went no farther than to consider the effect of the operations of a motor carrier upon the business of the competitors of the Missouri Pacific as one of the elements to be weighed in passing upon the application of the motor carrier for a certificate of public convenience and necessity. In Santa Fe Trail Stages, Inc., Common Carrier Application, 21 M.C.C. 725 (1940), a motor vehicle company applied for a certificate of public convenience and necessity under the Motor Carrier Act. The corporation was controlled by a wholly-owned affiliate of the Santa Fe Railway. The Commission in granting the application held that a finding that the acquisition of the motor carrier by the railroad would promote the public interest by enabling the railroad to use service by motor vehicle to public advantage in its operations was only required in case of an application for acquisition of control such as was involved in Pennsylvania Truck Lines Inc.-Control-Barker, 1 M.C.C. 101, 5 M.C.C. 9 and 49, and not where an application was made for a certificate of convenience and necessity. In granting such a certificate the Commission said with reference to the above Barker decision: "While it may be conceded that the applicant herein serves points not served by the Santa Fe Railway and that to some extent its extensions do not strictly parallel the Santa Fe rails, we are of the opinion that the principle there announced has no application in the instant proceeding, wherein the controlling issue is whether the public needs the service proposed, and not, as in a proceeding under Section 213, the propriety of permitting a railway carrier to take over an existing and competing motor-carrier service."

The same conclusion was reached as to the requirements for a certificate of public convenience and necessity in St. Andrews Bay Transportation Company Extension of Operations, 3 M.C.C. 711, 715.

The foregoing would seem to indicate that the issuance of the certificates to Export was not dependent upon conformity with Section 408(b), though the ability of Export to meet the standards therein might be considered by the Board and by the President in connection with granting certificates of public convenience and necessity. We find no provision of the Civil Aeronautics Act requiring the Board to withhold certificates until after approval of the control of Export by its parent company.

In view of the finding of the Board that the air carrier was fit, willing and able to perform the air transportation and to conform to the provisions of the act and the rules and regulations of the Board thereunder, and that such air transportation was required by the public convenience and necessity regardless of whether the present relations of Export to the steamship company continue, we think that the issuance of the certificates cannot be questioned. But even though the certificates may not be questioned for lack of approval of the acquisition of control of Export by its parent corporation, it does not follow that Export's application under Section 408 was rightly dismissed.

Because of the terms of Section 408(a) (5) and Section 408(b), whereby a person seeking approval of acquisition of control shall present an application to the Board and his application shall be approved by the latter upon such terms as it shall find just and reasonable and with such modifications as it may prescribe, provided "the transaction proposed will promote the public interest by enabling such carrier other than an air carrier to use aircraft to public advantage in its operation and will not restrain competition", we think the Board ought not to have dismissed the application but should have proceeded to deal with it on the merits. Accordingly the order of July 12, 1940, should be reversed and the proceeding upon the application under Section 408 should be remitted to the Board in order to take such steps in the matter as may be just and proper. If control of Export by American Export Lines, Inc., is not found to be warranted, the Board, under Section 408(e), may require the parent company, after notice and hearing, "to take such action * * * as may be necessary * * * to prevent further violation * * *" of Section 408(a). The action required might be to cease to hold a controlling interest in Export by disposing of a portion of its stock.

### Application for a Rehearing.

This application requires but brief consideration. The arguments directed to the form of the certificates and the

effect of Section 408 upon their issuance we have already dealt with. The contention that Export should have shown that it had acquired landing rights in Portugal in order to demonstrate its fitness to conduct air transportation from the United States to Lisbon is without merit. The acquisition of landing rights is dependent on negotiations between this government and the foreign government concerned and involves matters peculiarly within the field of executive discretion. Like franchises which interstate carriers are required to have in order to operate in another state, the possession of landing rights is not required in order to obtain a certificate of public convenience and necessity.

The only argument for a rehearing that has any plausibility is based upon supposed changes in the volume of traffic from the United States to Europe between January 10, 1940, when the case was submitted to the Board, and July 12, 1940, when the decision granting the temporary certificate was rendered. A rehearing for this reason would have had no substantial basis and was properly denied.

The Civil Aeronautics Act contains the following declarations of policy in Section 2, Subdivisions (a) and (d), 49 U.S. C.A. § 402(a, d):

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

*    *    *    *    *    *

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense."

In the face of such declarations of policy it would seem extraordinary if the government cannot give even a temporary certificate for air carriage to a prospective competitor of Pan American when the latter holds a monopoly in such foreign transportation. Before the Board rendered its decision on July 12, 1940, the fall

of France, the conquest of Belgium and Holland by, the Reich, and the active entry of Italy into the war, already foreshadowed the involvement of the United States. The destruction of shipping on an unprecedented scale was notorious. These things all rendered the greater use of air carriage in the near future likely, if not inevitable. The decrease of ocean freight between the United States and Europe from January, 1940, to July, 1940, had little bearing on future demands for passenger, freight and mail transportation, particularly when no statistics were furnished for the increasing westbound traffic occasioned by the embarkation of refugees from European ports for America. Certainly there was no proof of what carriage by air might be needed. Pan American admits that since the close of the hearing it has increased its own trips from two to three per week and that there was a proportionate increase in the mail moving by air.

We think that there was no indication of a reasonable prospect of less air traffic, but that the inference is quite the contrary. Unless we are to assume that air carriage, which has in general been growing vastly, is to stagnate in the future, and unless the nation is to be given no chance to avail itself of the stimulus of competition between air carriers engaged in foreign service, there is nothing since the close of the hearings on January 10, 1940, which affords a reason for a change in the decision of the Board.

The motion to dismiss the petition to review is granted, because of lack of jurisdiction, as to so much of the order of July 12, 1940, as authorized the issue of temporary certificates of public convenience and necessity, but in other respects is denied.

The order of August 14, 1940, denying the petition of Pan American for a rehearing is affirmed.

That portion of the order of July 12, 1940, dismissing the application made under Section 408 asking for approval of the control of American Export Airlines, Inc., by American Export Lines, Inc., is reversed and the proceeding on the application under Section 408 is remanded to the Board in order that it may take such steps therein in accordance with this opinion as law and justice may require. No costs.