GRACE LINE, Inc., et al., Plaintiffs-Appellants,

and

National Bulk Carriers, Inc., et al., Intervening Plaintiffs-Appellants,

v.

PANAMA CANAL COMPANY, Defendant-Appellee.

No. 111, Docket 24226.

United States Court of Appeals Second Circuit.

Argued Nov. 13, 14, 1956.

Decided April 8, 1957.

C. Dickerman Williams, of Maclay, Morgan & Williams, New York City (J. Stewart Harrison, of Brobeck, Phleger & Harrison, San Francisco, Cal., and William I. Stoddard, of Maclay, Morgan & Williams, New York City, on the brief), for plaintiffs-appellants and intervening plaintiffs-appellants.

George Cochran Doub, Asst. Atty. Gen. (Leavenworth Colby, Chief Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., Paul A. Sweeney and Herman Marcuse, Attys., Dept. of Justice, Washington, D. C., and Benjamin H. Berman, Atty. in Charge, Admiralty & Shipping Section, Dept. of Justice, New York City, on the brief), for Panama Canal Company, defendant-appellee.

Brief by James M. Estabrook, New York City, as amicus curiæ in support of plaintiffs-appellants.

Before CLARK, Chief Judge, and FRANK [1] and HINCKS, Circuit Judges.

[1] Judge Frank heard arguments in this case, but died before this opinion was prepared.

CLARK, Chief Judge.

This appeal concerns the power of a federal district court to compel the government corporation which operates the Panama Canal to set tolls according to the new formula established by Congress in 1950 and to repay canal users several million dollars damages for excess tolls charged. It raises interesting and important questions as to judicial responsibility and authority when administrative action is dilatory or lacking.

A class action by canal users seeking this relief ended in summary judgment for the defendant below, when Judge Walsh concluded that he lacked jurisdiction over the subject matter and over an indispensable party. In brief, he interpreted the 1950 statute[2] as giving the defendant discretion to defer use of the new formula and denying judicial review of the defendant's decision. The history of toll regulation in the canal illuminates the conflicting interpretations of the most recent statute.

From 1912 to 1948 two different government bureaus operated commercial enterprises in the Canal Zone. Under 1902 legislation the President owned all the stock of Panama Railroad Company, a corporate ancestor of the present defendant which ran a railroad, a shipping line, and miscellaneous ventures. After 1912 there also existed The Panama Canal, an unincorporated agency headed by a governor whom the President appointed. This agency administered the civil government of the Canal Zone and operated the canal itself.

The President had statutory authority to fix canal tolls at his discretion between 75 cents and a dollar per laden ton, and a formula was worked out by the President, the Treasury Department, and the governor whereby tolls would be set high enough to cover operating expenses of the canal, "interest," and the cost of civil government in the Canal Zone. Canal users protested that the cost formula was unfair to them, and in later years tolls were set much lower than the formula would have required. As expenses rose, the toll rate required by the formula became greater than the statutory maximum of $1.00, while the toll remained constant at 90 cents a laden ton.

Meanwhile Panama Railroad Company, which bore very little of the burden of government in the Canal Zone, continued its highly profitable operations, returning a surplus to the Treasury. The corporation made no financial reports to Congress and was not supervised by the Bureau of the Budget or the General Accounting Office. In 1948 to obtain greater financial supervision Congress reorganized the defendant's predecessor under federal law as a government corporation,[3] subjecting it to the requirements of the Government Corporation Control Act of 1945.[4] Henceforth it was required to keep books in the fashion of a commercial business for annual submission to Congress after Presidential revision, and it was to be audited periodically by the General Accounting Office, which, in turn, reported to Congress.

The same year President Truman announced a rise in canal tolls to $1.00 per laden ton to meet continuing deficits from The Panama Canal. When the shipping industry responded with severe protests the increase was deferred pending study by congressional committees and the Bureau of the Budget. A three-cornered struggle developed. The railroads wanted to prevent what they considered a subsidy to shipping—operation of the canal below "cost." The Bureau of the Budget wanted increased revenue from the canal operation and better bookkeeping procedures. The shipping

---

2. Act of Sept. 26, 1950, 64 Stat. 1038, amending Title 2, §§ 411, 412, of the Canal Zone Code, approved June 19, 1934, 48 Stat. 1122. The Canal Zone Code does not constitute a part of the United States Code.

3. Act of June 29, 1948, 62 Stat. 1075.

4. 59 Stat. 597, 31 U.S.C. §§ 841–871.

lines wanted revision of the formula for determining "costs" of the canal to enable the canal to be "self-sustaining" without greatly raising tolls.

The resulting compromise is the statute now before us. Ownership of the physical properties of the canal was transferred from the governor's agency to the defendant corporation, now rechristened Panama Canal Company, which was to be operated by its board of directors like a commercial business, dealing with other government agencies on a business footing and meeting its expenditure from its own income. The cost of civil government in the Canal Zone was to be borne by the defendant, in lieu of taxes; and this cost was to be apportioned among the various business enterprises equitably, thus relieving the former heavy burden on the canal operation. As part of the new scheme, tollmaking authority was transferred from the President to the defendant, and the statutory maxima and minima were removed. Tolls were to be set to cover costs, which were defined by statute for the first time; and the new cost formula was made more favorable to canal users than the previous informal arrangement of the President, the Treasury Department, and the governor.[5]

Both Congress and the President retained some control over toll-fixing. The annual budget reports to Congress and the periodic GAO audits required under the Government Corporation Control Act would henceforth cover the operation of the canal, now that it, too, was run by the defendant. The President retained the power to appoint the members of the defendant's board of directors, and no change in tolls could be made without his approval.

For three years after passage of the Act the defendant submitted its annual budgets to Congress, reporting a profit from its combined operations, but not allocating the cost of interest or civil government among its various enterprises.[6] No objections were taken to these budgets by Congress and no steps were taken by the defendant to change toll rates. The present controversy began in 1955 when the General Accounting Office completed its audit of the defendant and reported:

"* * * The Company, as a whole, has been self-sustaining. However, the Company did not have available for our examination an analysis to determine the financial results by activities. We have prepared such an analysis by allocating general corporate expenses (interest, net cost of Canal Zone Government and administrative and other general expenses) to the activity operating results reported by the Company. * * *

"The analysis of the Company, reported net income of $13,000,000 for 3 years since the reorganization shows that, contrary to the apparent expectation of the Congress, the canal activity had a net income of $28,000,000 and business activities had losses of $15,000,000. * * *

"* * * Thus the net income from the canal activity is being used to offset losses from business activities. "* * * We interpret the legislation as precluding any losses sustained by the Panama Canal Com-

---

5. The major changes were that interest during construction was no longer included in capital investment; costs of civil government were no longer borne almost exclusively by the canal users; interest was reduced to commercial rates; and military vessels were to pay for their transits. A proposal to allocate half the cost of the canal to national defense was rejected.

6. Defendant's annual reports for the fiscal years ending June 30, 1952, 1953, and 1954, were attached as exhibits to an affidavit submitted by the plaintiffs. Criticism of the defendant's reports is detailed in the Comptroller General's Audit Report to the Congress of the United States on Panama Canal Company and Canal Zone Government for the Fiscal Year Ended June 30, 1955, 29–30 (hereafter cited as 1955 Audit).

848

pany in the operation and maintenance of business facilities being included in the basis for determining tolls under section 412(b). Based on the financial results of the canal activity for the past 3 years, toll rates would have to be reduced substantially if hearings were held at this time."[7]

The GAO attributed the loss from other business activities to inefficient management, reapportionment of the burden of civil government, and a diminished market for the goods and services of these enterprises.[8] The unexpected profit of the canal operation probably stems from the steady increase in foreign commercial volume since 1947.[9] The General Accounting Office did not believe that existing legislation author-

ized the defendant to continue recovering business activity losses through canal tolls and unsuccessfully sought amendment of § 412(b) of the 1950 Act to accomplish that end.[10]

Judge Walsh rejected the General Accounting Office's construction of the 1950 amendments, which the plaintiffs support, and approved that of defendant Panama Canal Company. We turn first to this question of statutory interpretation.

### I. Meaning of the 1950 Statute

■ *A. Statutory Text.* The old and new versions of §§ 411 and 412 are printed in the margin for comparison, since the first phase of argument concerns the significance of the changes in wording adopted in 1950.[11] The de-

---

7. Report on Audit of Panama Canal Zone Government for the Fiscal Year Ended June 30, 1954, 2–3.

8. 1955 Audit, 34–36.

9. In the four years after the transfer of the canal to the defendant, foreign toll revenues rose from $16,935,823 to $23,442,170 per year, while American tolls went from $9,986,708 to $10,407,307. 1955 Audit, 3.

Congress had recognized that future tolls would depend on the volume of traffic, e. g., Sen.Rep. No. 2531, 81st Cong., 2d Sess. 5 (1950), but had not anticipated a rise in volume of such proportions. Shipping line representatives had testified that American commercial volume was declining, while government spokesmen pointed out that the total volume of commercial shipping had gone up sharply in the past year. Hearings before the Subcommittee on Maintenance and Operation of the Panama Canal of the Senate Committee on Armed Services, 81st Cong., 2d Sess. 16, 20, 39 (1950).

10. 1955 Audit, 1–4, 19.

11. "Chapter 23.—Tolls for Use of Canal
"411. Authority [of President] to Prescribe [and Change] Measurement Rules and Tolls.—The [President] *Panama Canal Company* is authorized [subject to the provisions of the section next following] to prescribe and from time to time change *(1) the rules for the measurement of vessels for the Panama Canal, and (2), subject to the provisions of the sec-*

*tion next following,* the tolls that shall be levied [by the Government of the United States] for the use of the Panama Canal [, but no tolls when prescribed as above shall be changed unless six months' notice is given by the President by proclamation.] : *Provided, however, That the rules of measurement, and the rates of tolls, prevailing on the effective date of this amended section shall continue in effect until changed as provided in this section: Provided further, That the said corporation shall give six months' notice, by publication in the Federal Register, of any and all proposed changes * * * in rates of tolls, during which period a public hearing shall be conducted: And provided further, That changes in basic rules of measurement and changes in rates of tolls shall be subject to, and shall take effect upon, the approval of the President of the United States, whose action in such matter shall be final and conclusive.*

"412. Bases of Tolls [; Maximum and Minimum Rates].—*(a)* Tolls on merchant vessels, army and navy transports, colliers, *tankers,* hospital ships, supply ships, and yachts shall be based on net vessel-tons of one hundred cubic feet each of actual earning capacity determined in accordance with the [Rules] *rules* for the [Measurement] *measurement* of [Vessels] *vessels* for the Panama Canal, [prescribed by the President and as may be modified by him from time to time by proclamation,] and tolls on other floating craft shall be based on displacement tonnage. [Provided, That the basic rules of

fendant views § 411 as controlling and finds great significance in the use of the verb "authorized," which it contrasts with the mandatory word "shall," found in other parts of the statute.[12] The plaintiffs reply that § 411 merely identifies the person delegated with toll-fixing power and prescribes the procedure, while the obligation to set tolls according to formula flows from § 412, where the mandatory language is found.

Defendant next points to the retention in § 411 of the words "prescribe and from time to time change" which were also used in the earlier version of the statute conferring discretionary power on the President. From this we are asked to infer that similar discretionary power is to be exercised by the new authority. Plaintiffs reply that the old scheme was only discretionary within statutory limits and that on occasion the President sought congressional approval even for changes within these limits.[13] They also cite the first section of Article III of the Hay-Pauncefote Treaty of November 18, 1901, restricting Presidential discretion by the re-

measurement shall not be changed except after public hearing and six months' public notice of such change. The rate of tolls on laden vessels shall not exceed $1, nor be less than $0.75 per net vessel-ton as determined under the aforesaid rules, and] *The rate of tolls* on vessels in ballast without passengers or cargo [the rate] may be less than the rate of tolls for vessels with passengers or cargo. [In addition to the tolls based on measurement or displacement tonnage, tolls may be levied on passengers at rates not to exceed $1.50 for each passenger.]

*"(b) Tolls shall be prescribed at a rate or rates calculated to cover, as nearly as practicable, all costs of maintaining and operating the Panama Canal, together with the facilities and appurtenances related thereto, including interest and depreciation, and an appropriate share of the net costs of operation of the agency known as the Canal Zone Government. In the determination of such appropriate share, substantial weight shall be given to the ratio of the estimated gross revenues from tolls to the estimated total gross revenues of the said corporation exclusive of the cost of commodities resold, and exclusive of revenues arising from transactions within the said corporation or from transactions with the Canal Zone Government.*

*"(c) Vessels operated by the United States, including warships, naval tenders, colliers, tankers, transports, hospital ships, and other vessels owned or chartered by the United States for transporting troops or supplies, may in the discretion of the President of the United States be required to pay tolls. In the event, however, that such vessels are not required to pay tolls, the tolls thereon shall nevertheless be computed and the amounts thereof shall be treated as reve-*

*nues of the Panama Canal Company for the purpose of prescribing the rates of tolls, and shall be offset against the obligations of the said corporation under paragraphs (c) and (e) of section 246 of this title, as amended.*

*"(d)* The levy of tolls is subject to the provisions of section 1 of article *III of the treaty between the United States of America and Great Britain concluded on November 18, 1901, of articles XVIII and XIX* of the convention between the United States of America and the Republic of Panama [entered into] *concluded on* November 18, 1903, and of article I of the treaty between the United States of America and the Republic of Colombia proclaimed on March 30, 1922.

*"(e) Capital investment for interest purposes shall not include any interest during construction."*

12. And see, e. g., United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 418, 420, 51 S.Ct. 502, 75 L.Ed. 1148; United States ex rel. Simons v. Hines, 63 App. D.C. 55, 69 F.2d 229. But see Supervisors v. United States, 4 Wall. 435, 445–447, 71 U.S. 435, 18 L.Ed. 419; United States Sugar Equalization Board v. P. De Ronde & Co., 3 Cir., 7 F.2d 981, 985–986, certiorari dismissed 271 U.S. 691, 46 S.Ct. 631, 70 L.Ed. 1154.

13. In 1937 confusion over the statutory definition of tonnage led President Roosevelt to appoint a committee, which recommended revision of § 412 to provide for measurement rules. Sen.Doc. No. 23, 75th Cong., 1st Sess. On August 24, 1937, the committee's recommendation was enacted by Congress, 50 Stat. 750, and the President revised tolls accordingly three days later. President Proclamation No. 2248, 2 Fed.Reg. 1765–1774, 51 Stat. 372.

quirement that all tolls be "just and equitable."[14]

The transposition of the phrase "subject to the provisions of the section next following" to modify the word "change," instead of the word "authorized," indicates to the defendant that the mandatory provisions of § 412 were applicable only when and if changes in tolls were attempted. Plaintiffs however contend that the transposition, if at all significant, meant only that toll-making was subject to § 412, while the rules for measuring vessels were not. The plaintiffs also say that another part of the statute making legislation effective as of the time when the President transferred the canal to the corporation[15] answers the defendant's claim that §§ 411 and 412 fail to specify when the formula should go into effect, thus indicating discretion to delay utilizing the new scheme.

Finally, the defendant draws us to the proviso in § 411 that "the rates of tolls, prevailing on the effective date of this amended section shall continue in effect until changed as provided in this section." But this may have been intended to continue the legal authority of the old tolls fixed by the President during the interregnum when the President was no longer authorized to promulgate tolls and his corporate successor had not yet promulgated any, and would not be inconsistent with plaintiffs' position.

Summing up, the defendant would read the two sections as governing any future effort to change tolls, but leaving it entirely up to the defendant when and if any changes should be attempted. The plaintiffs just as cogently glean from the language a requirement that once the properties of the canal are given to the defendant the new formula must be applied with reasonable speed. Both interpretations are reasonable from the naked words, and we must seek further for their meaning.

*B. · Legislative History.* During the three-year legislative progress of the statute there was no discussion of the possibility that the new law would work out to mean a drop in toll rates which the defendant might be reluctant to announce. The universal assumption of legislators and lobbyists was that the new § 412 would authorize an increase in some amount,[16] which the defendant would announce as soon as the necessary computations were completed.[17] The shipping industry, for example, lobbied to place a $1.00 maximum on tolls, holding the rise to 10 cents a laden ton.[18]

14. "The United States adopts, as the basis of the neutralization of such ship canal, the following Rules, substantially as embodied in the Convention of Constantinople, signed the 28th October, 1888, for the free navigation of the Suez Canal, that is to say:
"1. The canal shall be free and open to the vessels of commerce and of war of all nations observing these Rules, on terms of entire equality, so that there shall be no discrimination against any such nation, or its citizens or subjects, in respect of the conditions or charges of traffic, or otherwise. Such conditions and charges of traffic shall be just and equitable." 32 Stat. 1903. The treaty is incorporated by reference into § 412 (d), Tit. 2, of the Canal Zone Code.

15. Act of Sept. 26, 1950, § 14, 64 Stat. 1043. The transfer occurred July 1, 1951. Exec.Order No. 10263, 16 Fed. Reg. 6333, U.S.Code Cong. & Adm.Service 1951, p. 1050.

16. Hearings, supra note 9, at 8, 15, 28; Hearings before the Subcommittee on the Panama Canal of the House Committee on Merchant Marine and Fisheries, 81st Cong., 2d Sess. 68, 141 (1950); Sen.Rep. No. 2531, 81st Cong., 2d Sess. 5 (1950); 96 Cong.Rec. 13375, 14672 (1950).

17. The Bureau of the Budget, which presented the bill which became law, expected the computations to take one year. A Report and Recommendations of the Bureau of the Budget, H.R.Doc. No. 460, 81st Cong., 2d Sess. 16 (1950) (hereafter, Bureau of the Budget Report); Hearings, supra note 16, at 48.

18. E. g., Hearings, supra note 16, at 76–82; Hearings, supra note 9, at 11–17. The proposal passed the House, but was

The old informal formula of the President, the Treasury Department, and the governor had long indicated that an increase was in order;[19] and since 1948 the President had been impatient to proclaim the maximum statutory toll.[20] The major concern was that the defendant might be required by rising costs to raise tolls to the point where the intercoastal shipping industry could no longer compete with the railroads,[21] and the statutory proviso that toll increases be approved by the President was designed to safeguard the ship lines in that eventuality.[22]

The scope of the defendant's discretion must therefore be inferred from the general scheme of regulation which Congress created. The major change was the transfer of toll-making authority from the President to a government corporation organized on commercial lines. This was coupled with abandonment of the old statutory maxima and minima in favor of a single requirement that tolls cover costs. The latter were carefully delineated by Congress for the first time. These changes together spell an intention to change toll-making from a political decision made by the President to an economic decision made by the defendant corporation.[23]

A certain latitude was allowed the defendant in deciding how frequently to change tolls, but this was limited by the requirement that in the long run tolls must reflect costs.[24] Congress was expected to review these short-range

rejected by the Senate Committee. Sen. Rep. No. 2531, 81st Cong., 2d Sess. 4 (1950).

19. The last time the old formula indicated the propriety of reducing tolls was in 1931, and the following year the formula was revised to remove the national defense write-off of some canal costs. Hearings, supra note 9, at 39. At the time the 1950 statute was passed, application of the old formula would have meant an increase of from 45 to 50 cents per ton. Hearings, supra note 9, at 7, 17, 24.

20. On March 26, 1948, President Truman proclaimed a toll rise effective in six months. Presidential Proclamation No. 2775, 3 CFR 30 (1948 Supp.), U.S.Code Cong.Service 1948, p. 2537. The effective date was postponed to April 1, 1949, September 1, 1949, April 1, 1950, and finally April 1, 1951, while Congress considered the present statute; and upon passage of the present law the original announcement of an increase was revoked. Presidential Proclamation No. 2903, 3 CFR 56 (1950 Supp.), U.S. Code Cong.Service 1950, p. 1535, revoking Proclamations 2775, 2808, 2831, 2852, and 2875, U.S.Code Cong.Service 1948, pp. 2537, 2599, U.S.Code Cong. Service 1949, pp. 2594, 2619, U.S.Code Cong.Service 1950, p. 1489.

21. Hearings, supra note 9, at 11, 14–16, 27, 36, 39; Hearings, supra note 16, at 67–69, 82–83, 102–125, 133–134, 142–152.

22. Hearings, supra note 9, at 7; Bureau of the Budget Report at 17.

23. E. g., "If there is agreement as to the formula for establishing the toll rates and adequate business-type accounts and financial reporting, there is no sound reason for not delegating the rate-making function to the Company's Board of Directors, as has been done in the case of other Government corporations, such as TVA, which set the rates to be charged for their services." Statement of Harold Seidman, Accompanied by Russell Roane, Representing the Bureau of the Budget, Hearings, supra note 9, at 7, and Hearings, supra note 16, at 46. See also Bureau of the Budget Report at 16.

Throughout the hearings and debate it was assumed that, under the new law, tolls would be set by the defendant to make the canal self-sustaining, and there was virtually no mention of the President's veto power. Hearings, supra note 9, at 9, 11, 18, 27, 36; Hearings, supra note 16, at 54, 66, 68, 133, 139; 96 Cong. Rec. 13371–13380, 14671–14672.

24. "The present basis of establishing tolls rates does not lend itself to the ready adjustment of rates, either up or down, to reflect increases or decreases in costs or changes in commercial conditions. * * It is significant that the tolls rates have not been changed under this formula since 1938.

 * * * * *

"While the tolls rate should not be changed on a year-to-year basis since 1 year's experience is insufficient to reflect accurately long-range trends, the rate should be adjusted periodically as changes take place in the factors that determine the charges that should be made

decisions with the aid of the defendant's annual budgets, but neither Congress nor the defendant was authorized to ignore the statutory formula indefinitely for reasons of policy or convenience.[25]

This last power was given the President, apparently to protect the American shipping industry.[26] Exercise of the Presidential veto was hardly discussed during the legislative history of the Act, and the apparent assumption of all concerned was that as a general rule the defendant's rate changes would become law. It was clear to Congress that the Hay-Pauncefote Treaty forbade discrimination against foreign vessels, so that any Presidential veto of rate increases would have to subsidize not only American lines, but the foreign lines, which comprised more than half the canal's commercial volume.[27]

That the defendant would defer toll changes in order to apply canal profits to cover its losses in other enterprises never occurred to the legislators. Although the cost formulae of the other ventures were not spelled out in the statute, each enterprise was expected to be self-sustaining[28] and the annual commercial-style budget of the defendant corporation was expected to facilitate congressional scrutiny of the various operations. Until the GAO audit the defendant's ambiguous bookkeeping concealed the fact that the Treasury was

being deprived of profits made in operating the canal, so that consumers of goods and services furnished by the other ventures could enjoy them below cost—the very type of subsidy the Government Corporation Control Act and the 1950 amendments to the Panama Canal Act were designed to prevent. The men who spent three years hammering out a compromise toll formula for future operation of the canal did not mean to give the defendant's board of directors carte blanche to ignore the statutory mandate whenever the defendant's other business ventures were losing money.

We conclude that Panama Canal Company was expected to propose changes in tolls for Presidential approval whenever it became apparent that tolls were substantially out of line with costs. While it was given discretion to defer proposals of change for short periods of time where it believed the discrepancy between costs and revenue was due to a temporary factor, it could not delay such proposals unreasonably long.

## II. Defendant's Asserted Discretion to Delay

Defendant contends that, even if it was required to propose changes with reasonable frequency, it has been justified in delaying action until an appraisal of the property was completed, without which depreciation and interest could not be accurately estimated.[29] The

---

for the use of the Canal. As the 1937 special committee expressed it:

" 'Economic and commercial conditions are not static. The Panama Canal is a facility for the service of interoceanic commerce. The charges for the service should receive such adjustments from time to time as will keep the charges in harmony with the needs of the Canal and the requirements that must be met in making the Canal the servant and assistant of international intercourse.' " Bureau of the Budget Report at 16.

Congress recognized the possibility that in the long run the new formula might require reduction of tolls. Bureau of the Budget Report at 16; Hearings, supra note 9, at 18, 36; Hearings, supra note 16, at 139; Sen.Rep. No. 2531, 81st Cong., 2d Sess. 5 (1950).

25. Hearings, supra note 16, at 49–50.

26. Notes 21, 22 supra.

27. Hearings, supra note 9, at 13, 23; Hearings, supra note 16, at 67, 146–147; 96 Cong.Rec. 13373–13379.

28. Bureau of the Budget Report at 14; Hearings, supra note 9, at 8, 18–19, 22; Hearings, supra note 16, at 66–67, 74; Sen.Rep. No. 2531, 81st Cong., 2d Sess. 4 (1950); H.R.Rep. No. 2935, 81st Cong., 2d Sess. 3 (1950).

29. The defendant gives as its reason for not promulgating new tolls on its estimate of the property's value: "In view of the policy that tolls should remain stable over a period of years, it is evident that Congress did not intend tolls to be determined upon so tenuous and

appraisal has now been finished and further delay cannot be justified on that ground.[30] It further suggests that the Korean War, pending legislation to alter § 412, and the 1955 treaty with Panama have introduced "uncertainty rendering it unwise to change tolls at the present time." It has been five years since the new formula went into effect and almost two decades since the tolls were last changed. Uncertainty has become the norm in world affairs. The legislative policy is to make tolls reflect changes in these uncertainties, and not to suspend all changes until world conditions become static;[31] further delay is not an exercise of the defendant's conceded discretion to determine the frequency of toll changes, but an arbitrary refusal to obey the mandatory requirement of § 412 that tolls be set in accord with costs.

### III. Judicial Review of Administrative Non-Action

We thus reach the question of judicial review. Judge Walsh stated his conclusion that such review was not intended by Congress in several ways: failure to join the United States as an indispensable party; no standing to sue; inability to compel a government officer to exercise his discretion by writ of mandamus; and lack of finality in the defendant's action, which is subject to Presidential revision. On appeal defendant also suggests that a district court outside the District of Columbia lacks power to issue writs of mandamus, and that courts should not review the management of the public domain.

There is nothing in §§ 411 and 412 expressly authorizing or expressly precluding judicial review. Unless constitutional limitations exist, our power to grant relief in the premises is a matter of congressional will; and these various doctrines only point up relevant factors in our search for the silent legislative intent. We turn first to the problem of Presidential revision.

 Defendant states, and we agree, that we have no power to review government decisions which are not final, and that tolls proposed by the defendant, but not yet approved by the President, lack the requisite finality. Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568; Pan American Airways Co. v. Civil Aeronautics Board, 2 Cir., 121 F.2d 810. In this suit, however, we are concerned not with proposed rate changes, but with the defendant's refusal to make such proposals—a decision which has finality and which is certainly effective without any approval by the President. The defendant's refusal to start the machinery for toll changes is like a court's refusal to start the process of adjudication by granting a defendant's motion to dismiss a complaint. Such a decision is a final order, although the opposite decision, denying the motion, would not be.

From the cases of Chicago & Southern Air Lines v. Waterman S. S. Corp., supra, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568, and Pan American Airways Co. v. Civil Aeronautics Board, supra, 2 Cir., 121 F.2d 810, the defendant argues that, where Congress establishes an agency whose decisions require Presidential approval, all judicial examination of the agency's action or inaction is precluded. But the cases will not support so broad a proposition. Both those cases dealt with the construction of § 1006 of the Civil Aeronautics Act, 49 U.S.C. § 646, which authorizes judicial review of certain orders of the Civil Aeronautics Board; and the decision of this court and the Supreme Court was that the section did not authorize review of Board orders granting or deny-

temporary a basis." Defendant-Appellee's Brief, p. 42.

30. Id. p. 43.

31. See note 24 supra.

ing citizen carriers' applications for certificates of convenience and necessity to engage in overseas and foreign air transportation. Justice Jackson, writing for the Supreme Court majority, did not state the sweeping proposition now urged to us, but listed the factors which led him to conclude that § 1006 was not meant to include review of that type of agency decision: (1) Congress had expressly precluded judicial review of foreign carriers' applications to engage in foreign or overseas routes, suggesting a similar policy toward domestic carriers' applications of the identical kind; (2) air commerce, by virtue of its third dimension, novelty, and danger, poses special problems not present in the regulation of ship, truck, or train transportation; (3) aerial navigation routes and bases must be correlated with national defense plans and the conduct of foreign relations; (4) the express scheme for review of CAB decisions was to permit it where the Board performed conventional functions and to preclude it where the Board inverted the usual administrative process and acted as adviser to the President; (5) the President's role in the statutory plan was to co-ordinate legislative and executive powers to further the commercial, strategic, and diplomatic interests of this country in the realm of foreign affairs.

None of these considerations are present here. The defendant is a government corporation, expressly made suable on all its decisions without reservation. The subject matter being regulated—marine transportation—is familiar to the courts, as is the process of rate-making. The defendant's decisions are not complicated by factors of diplomacy or national defense, since the Hay-Pauncefote Treaty forbids use of the canal toll rate as a weapon of foreign policy. Accordingly the defendant's decisions will not involve national defense data and secret foreign intelligence, as was the case under the Civil Aeronautics Act.[32] The CAB's standard of "convenience and necessity" was much more vague than the formula expressed in § 412 to which the defendant corporation is to be held; and the type of CAB decisions discussed by the Supreme Court concerned the rate of expansion of the air transport industry, rather than, as here, the price to be paid by consumers to a government monopoly for services of a type frequently supplied by a public utility.[33]

It may be significant that review was sought in the case before the Supreme Court at a much later stage than here. There "submission of the Board's decision was made to the President, who disapproved certain portions of it and advised the Board of the changes which he required. The Board complied and submitted a revised order and opinion which the President approved. Only then were they made public, and that which was made public and which is before us is only the final order and opinion containing the President's amendments and bearing his approval." Chicago & Southern Air Lines v. Waterman S. S. Corp., supra, 333 U.S. 103, 110, 68 S.Ct. 431, 436, 92 L.Ed. 568. It may well be that no judicial review would be possible once the defendant's original proposal has been altered to conform

32. Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 111–112, 68 S.Ct. 431, 92 L.Ed. 568. Unlike the present law, the statute before the Supreme Court provided that CAB decisions "shall be submitted to the President before publication thereof." 49 U.S.C. § 601.

33. At the time the present statute was passed the most comparable waterway was the Suez Canal, then privately-owned. The tolls policy in Suez was frequently compared with that in Panama, Hearings, supra note 9, at 34, 37; Hearings, supra note 16, at 69–70, 135, 137–138, 142; 96 Cong.Rec. 13373; and the international treaty incorporated in § 412(d) of the present statute was modeled on that governing the Suez Canal. See note 14 supra.

with the President's political decision,[34] but that question is not now before us.

Panama Canal Company claims that we cannot now ignore the question, however, since it would be irresponsible to mandamus the defendant to action which would then be beyond judicial scrutiny. Assuming that this is true, it appears that in the normal situation tolls would be set by the defendant and approved by the President without alteration; there would then be no obstacle to court review. Although, on occasion, the President may intervene and thus preclude judicial review of the new rates, the mere possibility of frustration should not deprive the district court of the power to take the first step. See Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 218, 50 S.Ct. 320, 74 L.Ed. 809.

Nor is the defendant a mere adviser to the President of the type discussed in United States v. George S. Bush & Co., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259—a decision under the Tariff Act of 1930 (46 Stat. 590). The Act authorized the Tariff Commission to recommend increases in the statutory import duties if existing duties failed to equalize production costs of foreign and domestic articles. A recommendation to increase the duty on canned clams was approved by the President with the statutory finding that "in his judgment such rates of duty are shown by such investigation of the commission to be necessary to equalize such differences in costs of production." The Court of Customs and Patent Appeals, authorized to review "a question or questions of law only," held the increase invalid because in computing the cost of Japanese production the Commission and the President converted yen into dollars at the 1932 rate of exchange, instead of the rate of earlier years before Japan went off the gold standard. The Congress

had deliberately failed to specify the year on which exchange rates should be computed, and the President's method of solving the problem was held nonreviewable by the Supreme Court. "Whatever may be the scope of appellate jurisdiction conferred by § 501 of the Tariff Act of 1930, it certainly does not permit judicial examination of the judgment of the President that the rates of duty recommended by the Commission are necessary to equalize the differences in the domestic and foreign costs of production." United States v. George S. Bush & Co., supra, 310 U.S. 371, 379, 60 S.Ct. 944, 946, 84 L.Ed. 1259. The Court carefully limited its language to tariff acts, where for a century the President had been given wide discretion to make such decisions; and it noted that the Tariff Commission had traditionally acted as an adviser only, either to Congress or to the President. The differences between the background, subject matter, and language of the tariff statute and the present law dispel any inference that Congress intended the same scope of review for canal users as for importers of foreign commodities.

Even assuming the scope of review under that statute and this one to be the same, we think the Supreme Court would have allowed the Court of Customs and Patent Appeals to act in the event the Tariff Commission, like the present defendant, boldly refused to hold any hearings concerning rate changes despite adequate indications that changes were necessary to comply with the statutory formula. The present case would be more comparable to the Bush decision if the present plaintiffs were trying to declare new tolls invalid because of the type of depreciation computation chosen by the agency and approved by the President.

Before 1950 the President was authorized to set tolls, and the epithet "adviser" could properly be applied to

34. Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 112–114, 68 S.Ct. 431, 92 L.Ed. 568; but see Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868.

the governor of The Panama Canal. But if the changes in § 411 are to have any meaning the defendant is now the rate maker, and not a counselor. The legislative history similarly supports this.

As a last resort the defendant presses on us cases involving administration of the public domain;[35] but the problems presented by them are far removed from those of a government corporation organized on a commercial model, charging consumers for the type of services ordinarily supplied by private enterprise. Moreover, the public domain cases have no factor analogous to the treaty—the Hay-Pauncefote Treaty, supra—which here binds the government to conduct its venture in a fashion that will provide fair and equitable tolls for users of all lands. Compare Perkins v. Lukens Steel Co., 310 U.S. 113, 128, 129, 60 S.Ct. 869, 84 L.Ed. 1108, which the defendant cites.

The growing tendency of the courts and Congress has been to submit more matters once thought to concern internal government administration to examination in open court. See, e.g., Homovich v. Chapman, 89 U.S.App.D.C. 150, 191 F.2d 761 (Secretary of the Interior's regulations concerning Indians' wills); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (Attorney-General's listing of organizations for use in screening government personnel); Shachtman v. Dulles, 96 U.S. App.D.C. 287, 225 F.2d 938 (passport denial); Textile Workers Union of

America, C.I.O. v. Allendale Co., 96 U.S. App.D.C. 401, 226 F.2d 765 (Walsh-Healey Act determinations reviewable under ·the Fulbright Amendment, 66 Stat. 308, 41 U.S.C. § 43a, which overruled Perkins v. Lukens Steel Co., supra, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108); Administrative Procedure Act, 5 U.S.C. § 1009(c), "every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review." We think the intent of Congress was to allow judicial review in these circumstances.

■■ Nor is there any lack of standing to sue. Section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 1009 (a), confers standing on persons "suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute," and the plaintiffs can point to the Panama Canal Act of 1912, as amended in 1950, as well as the Hay-Pauncefote Treaty, as their statutory authority. Moreover, without legislation they have a right to judicial redress, since the corporation's action in charging tolls in excess of the statutory rate was "of a sort that, if taken by a private person, would create a right of action cognizable by the courts."[36] Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. 123, 152, 71 S.Ct. 624, 638, 95 L.Ed. 817 (concurring opinion of Justice Frankfurter).

Here there is no controversy over the proper person to sue; all users of the canal have been joined in a single class

35. E. g., United States v. Midwest Oil Co., 236 U.S. 459, 474, 35 S.Ct. 309, 59 L.Ed. 673; Butte City Water Co. v. Baker, 196 U.S. 119, 126, 25 S.Ct. 211, 49 L. Ed. 409; State of Alabama v. State of Texas, 347 U.S. 272, 273, 74 S.Ct. 481, 98 L.Ed. 689; United States v. City and County of San Francisco, 310 U.S. 16, 29-30, 60 S.Ct. 749, 84 L.Ed. 1050; Light v. United States, 220 U.S. 523, 537, 31 S.Ct. 485, 55 L.Ed. 570. Cf. Section 4 of the Administrative Procedure Act exempting from some rule-making requirements "any matter relating to agency management or personnel or to

public property, loans, grants, benefits, or contracts." 60 Stat. 238, 5 U.S.C. § 1003.

36. The right of a consumer to sue a utility which charges excessive tolls is established, e. g., Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 436, 27 S.Ct. 350, 51 L.Ed. 553; United States v. Public Utilities Commission of District of Columbia, 80 U.S.App.D.C. 227, 151 F.2d 609; Richman v. Consolidated Gas Co. of New York, 114 App. Div. 216, 100 N.Y.S. 81, affirmed 186 N.Y. 209, 78 N.E. 871.

action. The question is rather whether or not there is to be judicial review, since a finding of no standing here means that the courts have no power in the premises. See Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. 123, 186, 71 S.Ct. 624, 95 L.Ed. 817 (concurring opinion of Justice Jackson). From all that has gone before we conclude that court relief was not precluded and that the plaintiffs may seek it.

A final argument is made that legislative and executive supervision is sufficient and that judicial interference will prove cumbersome. The President's power to remove members of the defendant's board of directors and his veto power are stressed in this connection, as well as the supervisory power wielded by Congress through annual appropriation bills. But identical balances and checks rein most government agencies, whose decisions are nevertheless subject to judicial scrutiny. For the person unable to get redress from the busy legislature or White House the courts remain open.

### IV. The United States as Indispensable Party

■ The holding that the United States was an indispensable party applies, as we understand the opinion below, only in so far as the plaintiffs seek to recover money from the defendant, and not to the request for injunctive or mandamus relief. We do not pass on the necessity for joining the United States as defendant, since we think a money recovery is precluded by other considerations. Restitution of overcharges would require determination of the tolls that should have been set. Although the district court might reconstruct the tolls which the defendant corporation should have promulgated, there is no way of knowing whether or not the President would have approved them. Moreover, there is no statutory authority for utilizing the defendant's

facilities for measuring the amount of money to be awarded the plaintiffs in suits to recover overcharges. See Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 253–255, 71 S.Ct. 692, 95 L.Ed. 912. We find no evidence of a congressional intent to allow recovery of overcharges.

### V. Availability of the Remedy of Mandatory Injunction

■ Panama Canal Company's last argument rests on the doctrine that federal courts outside the District of Columbia lack statutory authority to issue writs of mandamus against government officers in the exercise of their original jurisdiction. McIntire v. Wood, 7 Cranch 504, 11 U.S. 504, 3 L.Ed. 420; Rosenbaum v. Bauer, 120 U.S. 450, 7 S.Ct. 633, 30 L.Ed. 743; Knapp v. Lake Shore & M. S. R. Co., 197 U.S. 536, 25 S.Ct. 538, 49 L.Ed. 870; Covington & C. Bridge Co. v. Hager, 203 U.S. 109, 27 S.Ct. 24, 51 L.Ed. 111. The lower federal courts have not been consistent in handling efforts to avoid this doctrine by actions for mandatory injunctions or declaratory judgment;[37] but we need not review those cases, since the McIntire line of cases is inapplicable to an action like the present one against a corporation. Virginian R. Co. v. System Federation No. 40, supra, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, affirming 4 Cir., 84 F.2d 641, 646. The present situation is even more favorable for issuing a mandatory injunction, since by congressional legislation the defendant was made suable in New York, rather than in the District of Columbia.

We conclude that the judgment of dismissal for the defendant should be reversed and summary judgment should be entered for the plaintiffs on their motion therefor to the extent set forth in, and in accordance with, this opinion.

Reversed and remanded for judgment for the plaintiffs.

37. See Note, 38 Col.L.Rev. 903 (1938).